Antonio Nathaniel **BONHAM**,
Appellant,

v.

The **STATE** of Texas, Appellee.

No. 68928.

Court of Criminal Appeals of Texas,
En Banc.

Nov. 21, 1984.

Rehearing Denied Feb. 20, 1985.

---

Robert A. Shults, Kristine C. Woldy, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and Winston E. Cochran, Jr., Rusty Hardin and Wilford Anderson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

This is an appeal from a conviction for capital murder. Punishment was assessed at death.

This case originally came before us in November of 1982. Appellant raised three grounds of error relating to the sufficiency of the evidence, the sufficiency of the indictment, and the voluntariness of his confession. On January 18, 1983, the appeal was abated because the trial court had made no written findings of fact as to the voluntariness of appellant's confession in accordance with Article 38.22, V.A.C.C.P. *Bonham v. State*, 644 S.W.2d 5 (Tex.Cr. App.1983). The cause is now before us again with a supplemental transcript containing the trial judge's written findings of

fact and conclusions of law. We now turn to the merits of the case.

Appellant contends that the evidence is insufficient to prove that he acted intentionally in causing the death of the victim. Appellant argues that, although he admitted in his written confession that he ran over the victim with the car, his confession does not contain a clear statement of intent. Furthermore, he argues the State's other evidence does not show an intent to kill and thus the evidence is insufficient to satisfy the element of the requisite culpable mental state.

The pertinent part of the indictment under which appellant was convicted reads as follows:

"... the Defendant, heretofore on or about July 9, 1981, did then and there unlawfully while in the course of committing and attempting to commit the Aggravated Robbery of Marie Jones McGOWEN, hereafter styled the Complainant, intentionally cause the death of the Complainant by driving an automobile over the Complainant's body."

According to appellant's confession which was introduced into evidence at trial, the victim, a sixty-two year old instructor at Massey Business College in downtown Houston, arrived at the college at approximately 7:00 a.m. on July 9, 1981.[1]

The appellant ambushed the victim on a sidewalk outside the business college and

1. Although the State introduced only a portion of appellant's written statement into evidence, the defense offered the remaining portion. For the purposes of this opinion, we are printing the entire confession. The material in the brackets was omitted by the State, but introduced by the defense:

"My name is Antonio Nathaniel Bonham I am a black male 21 years old. My birth date is 2–6–60. I live at 5214 Kenilwood with my mother, Vera Edwards, my sister Ivy and my niece Melodee.

"I had spent the night of July 8, 1981, wednesday (sic) with my father, Nathan Hubert Bonhan (sic) at his apartment 1822½ Palm # 2. The next morning I got up around 6:30 AM. This was thursday (sic) July 9, 1981. I put on a blue muscle shirt and a pair of dark green pants and black hush puppies shoes. I walked to Main Street sightseeing. When I got to Main Street I saw the woman driving a white car crossing Main Street. She was going behind the school to a parking lot. My intentions were to take her car. The only way I could get her car was to come in contact with her. [It was really my intensions (sic) never to harm the ladie (sic). But since I had been drinking heavily prior to this incident, the alcohol somehow took all controll (sic) of me. Then I decided that the pressures of socity (sic) of dealing with everyday life in terms of making decisions was so much of a problem that I decided that taking this car and the women would somehow relieve me of these pressures. Namely what I mean is that coping with socity (sic) was so hard that I got to the point in deciding that comitting (sic) this felony would some how help me over come (sic) my everyday (sic) difficulties. Being remourseful (sic) is something that is truly within me and I regrett (sic) the fact that I even got up that morning with thoughts of looking in the ways that I did.] While in the process of taking the car, I hit the women (sic) over the head with a brick. Then I took her car keys which were on the ground and walked to her car. She was on the ground face down. [After getting into the car I decided that leaving her there in the condition she was in should not be witnessed by the public.] So I drove the car to the back of the school and put her in the trunk of the car. Then I proceeded this mess by driving to a location that I was unaware of. In which that appeared to be all over Houston. I then drove to a wooden (sic) area after abusing her in the form that I had. [I resumed this mess purly (sic) by letting the women (sic) out of the car. In which she decided that sitting on the side of the road was something that she wanted to do of all things at this time. I then was in the process of heading to my destination of which I was unsure of.] My victim was still sitting on the side of the road [when I called myself trying to make her get some help]. [By trying to scear (sic) herwith (sic) the caras (sic) if I were going to run over her trying to make her get help I hadn't realized that] I had run over the woman already, until the car got stuck in the ditch. [I was keenly aware of the fact that I had made one of the biggest mistakes in my life. There after (sic) I was so startled with what I had done] I futher (sic) more tryed (sic) to get the car out of the ditch, by using different object s (sic) that were in the trunk of the car, but failed to do so in trying. Since there was no hope in getting the car out of the ditch I fled undecidedly where to go, on foot.

"I went to the 9th grade in school. I can read and write the english (sic) language. I have read the above statement and it is ture (sic) and correct. I have given this statement to Detective Schultz (sic) of my own free will no threats or promises were made to me to make this statement."

hit her on the back of the head with a brick, causing her skull to be fractured. The appellant then laid the victim in some bushes, took her car keys and drove her car up to the sidewalk. He placed the victim, who was apparently bleeding very badly, in the trunk of the car. According to appellant's own confession, he then proceeded to drive to a location where he raped the victim. After raping her, appellant drove the victim to a sparsely populated area on Schurmier road. There he put the victim out of the car and as she was sitting on the side of the road, he ran over her with the car. Evidence showed that when he struck her with the car, the car became lodged on the body. After unsuccessfully trying to back the car off the victim, appellant then put the car in reverse. When this did not work, appellant abandoned the car, leaving the victim crushed under the car.

Other evidence adduced at trial showed that when other business college instructors and students arrived at Massey Business College that morning they found Mrs. McGowen's personal belongings scattered around the ground and a pool of blood on the sidewalk. The police were called as was Mrs. McGowen's husband. Later that afternoon, at approximately 4:00 p.m., Officer W.J. Roper, who was on regular patrol, found Mrs. McGowen's car on Schurmier Road. Believing it to be an abandoned stolen car, he ran a check on the license number and found it as being wanted in a possible homicide. Homicide detectives were called as was Mrs. McGowen's husband. Officer Roper testified that when he found the car, it was partially in the ditch. Looking inside the car, Officer Roper saw a brassiere and a pair of woman's underwear in the back seat of the car. There was blood on both the front and back seats of the car. The officer also found blood on the front of the car. As Officer Roper walked around to the ditch-side of the car he found that the rear wheel of the car was mired in mud and a brief case had been placed underneath the rear wheel as if an attempt had been made to drive the car out of the mud.

Two people who lived or worked in the area told police that they had seen a black male driving Mrs. McGowen's car along the road between 11:15 and 11:30 that morning. Both men testified at trial that the driver of the car was a black male with short hair who appeared to be sitting very low in the seat. One of the two positively identified appellant as the driver of the car. Another witness, Oliver Ruble, testified that he left his home on Schurmier Road between 11:30 a.m. and 11:45 a.m. on the morning of July 9. He noticed that a car later identified as belonging to the victim had become stuck in the ditch. Ruble related that he got out and looked to see if anyone was in the car and needed assistance, but there was no one in the car.

When Mrs. McGowen's husband reached the scene, he found police searching the surrounding area for his wife's body. Mr. McGowen gave the police his set of car keys and when they looked in the trunk, they found blood smeared all over the inside of the trunk. McGowen testified that when he saw the briefcase underneath the rear tire, he wanted to make sure it belonged to his wife so he squatted down in the ditch and saw that his wife's body was pinned underneath the car.

Homicide detectives who were at the scene when the victim's body was found testified that the car was sitting so low that it was impossible to see underneath the car without kneeling down on all fours. After Mr. McGowen had spotted his wife's body, but before the wrecker lifted the car off the body, there was no clearance under the car for anyone to even reach under the car. Detectives found no skid marks at the scene and there was no evidence to indicate that the car had slid into the ditch. Finally, officers testified that when the body was finally recovered the victim's wedding ring, gold necklace and purse were missing.

Detective G.C. Shultz testified that appellant was arrested at his father's house on July 17, some eight days after the commission of the offense. After being in custody a short time, appellant agreed to give a

written statement. Shultz testified that appellant appeared to be very calm and collected and showed no remorse when giving his confession.

The autopsy report showed that Mrs. McGowen's death was caused by a fracture to the skull, a crushed chest and a broken neck all sustained when she was run over by the car. In addition as a result of being run over by the car, she sustained contusion hemorrhages and lacerations of the brain, subdural and epidural hemorrhage and hematoma, a fractured pelvis, open crushing fractures of the ankles, multiple contusions and lacerations of the head, trunk, back and extremities, and burn lesions of the back, left hip and left elbow. As a result of the sexual assault upon her by appellant the victim also suffered contusions, hemorrhage and lacerations of the external genitalia. Dr. Eduardo Bellas, the assistant medical examiner who performed the autopsy, testified that Mrs. McGowan's head injuries were consistent with being hit on the right side of the head with a car bumper. The crushing wounds to the victim's ankles were consistent with being rolled over by an automobile tire. Finally, he testified that the injuries to the victim's genitalia indicated that forcible intercourse had occurred prior to the victim's death.

Finally, Sgt. Steve Fowler of the Houston Police Department, who testified that he was trained in the field of accident reconstruction, testified that in his expert opinion the car bumper struck the right side of the victim's head as she was in a semi prone or sitting position. The victim was thrown on to her left side and her legs automatically tucked up underneath her. The vehicle then came to rest upon the victim's body. The vehicle was then put in reverse and the victim was then rolled over onto her right side, still in a tucked up position. Fowler testified that this body movement was evident from the presence of burns on the body apparently from the exhaust pipe and catalytic converter. The car again became stuck upon the body and the weight of the car began compressing the body into the ground. At this point the car was again put into forward gear, evi-denced by the fact that a portion of the victim's blouse was caught up on the undercarriage of the car and pulled in a forward motion away from the victim's body.

■■■■ In analyzing the sufficiency of the evidence the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Wilson v. State*, 654 S.W.2d 465 (Tex.Cr.App.1983); *Denby v. State*, 654 S.W.2d 457 (Tex.Cr.App.1983); *Freeman v. State*, 654 S.W.2d 450 (Tex.Cr. App.1983). It must also be remembered that the jury is the exclusive judge of the credibility of the witnesses and of the weight to be given their testimony. *Daniels v. State*, 600 S.W.2d 813 (Tex.Cr.App. 1980). The State argues correctly that this function extends not only to live testimony from the witness stand but also to statements made in written confessions which are introduced into evidence at trial. Clearly from their verdict, the jury chose to disbelieve appellant's exculpatory statements made in his written confession and introduced into evidence by the defense. That is their prerogative and we can not disturb their finding.

■■■■ If we were looking at one act alone, the mere running over of a pedestrian, we would have trouble in saying that the jury was correct in their finding of the proper intent. However, we are not operating in a vacuum. This offense started with a brutal assault and abduction compounded by the forcible rape and robbery of the sixty-two year old victim. It is hard to believe that after completing these horrendous acts upon his victim that appellant would drive to a sparsely populated area on the outskirts of Houston with the intent to release his victim and urge her to go for help. Furthermore, there is nothing in the record to suggest that after appellant ran over Mrs. McGowan with the car that he did anything to assist her. The evidence shows that appellant did not seek help for Mrs. McGowan. Indeed it took police offi-

cers eight days to track down the appellant and when he was confronted with his deeds and finally did admit them, appellant remained calm and collected and showed no type of remorse. From the evidence before us, we find the jury acted rationally in finding an intent to kill and we overrule appellant's challenge to the sufficiency of the evidence.

In his second ground of error, appellant argues that the indictment is fundamentally defective. As noted above, appellant was charged with committing a murder while in the course of committing aggravated robbery. Appellant argues that since V.T.C.A., Penal Code, Section 19.03(a)(2), only lists robbery as an aggravating offense in the capital murder statute, an allegation of aggravated robbery as an aggravating offense is an illegal expansion upon the statute.

The offense of aggravated robbery includes all the elements of robbery. V.T.C.A., Penal Code, Section 29.03. Thus, technically speaking, if one commits the offense of aggravated robbery, he is also guilty of committing the offense of robbery. The logical extension of this reasoning is that if one intentionally or knowingly causes the death of an individual in the course of committing or attempting to commit aggravated robbery, he is guilty of capital murder just as if such killing occurred while in the course of committing or attempting to commit robbery. We find that the indictment was not fundamentally defective. See *Carter v. State*, 650 S.W.2d 843 (Tex.App.—Houston (14th Dist) 1982), affirmed on other grounds, 650 S.W.2d 793 (Tex.Cr.App.1983); *Howard v. State*, 650 S.W.2d 460 (Tex.App.—Houston (14th Dist) 1982), affirmed on other grounds, 667 S.W.2d 524 (Tex.Cr.App.1984).

Finally, appellant contends that his written confession was improperly admitted into evidence as it was not voluntarily given but was the product of psychological coercion, deceit, fraud and trickery on the part of Detective Shultz.

The record shows that appellant was sleeping at his father's house during the early morning hours of July 17, when he was awakened by his father and told that the police were outside. When his father opened the door, the police came in with guns drawn and arrested him for the instant offense. Appellant was read his rights and taken to the police station. There Detective Shultz began discussing the case with him. After a short time appellant gave an oral confession. Thereafter he gave a written statement which was introduced into evidence during the trial of this cause. Appellant now contends that the evidence adduced at the hearing on the motion to suppress is uncontroverted that Detective Shultz induced the written confession by promising him a life sentence rather than the death penalty if he gave a written confession, and also deceived him into believing after their oral conversation about the offense that it would not make any difference if he made a written confession.

We will look first at appellant's contention that Detective Shultz promised him a life sentence if he gave a written confession. Appellant testified on direct examination at the hearing on his motion to suppress:

"Q. Did they ever show you any photographs?

"A. They did.

"Q. Were those photographs of the scene you heard described in this trial at the area of Massey Business College?

"A. That's true.

"Q. And did they make any remarks to you about those photographs or what might happen to the person involved or anything like that?

"A. Detective Schultz (sic) told me, he said, "These are the pictures the jury is going to see and they are going to determine what type of punishment you will get. And by making a statement you would get a life sentence rather than death.

. . . . .

"Q. When he told you making a statement might help you get a life sentence instead of a death sentence, what did you do as a result?

"A. Well, I considered if I was to be prosecuted for the charge I would rather a life sentence than a death."

On cross-examination, when the prosecutor asked appellant how Detective Shultz had threatened him, appellant replied:

"A. Told me whether I committed the charge or not I was going to be charged with it, and I was a dead man and bought and paid for by the State of Texas, and· if I didn't give a statement he was going to see to it I get a death penalty.

. . . . .

"Q. He told you he would get you life?

"A. He didn't say that.

"Q. What did he say?

"A. He said that the jury—by giving a statement the jury wouldn't give me the death penalty but would give me life because there is only two sentences."

Detective J.W. Ladd testified that he was asked to witness appellant's signature on the written statement. Detective Ladd testified that when he entered the room, he asked appellant if he (appellant) had read the statement. When appellant replied that he had, Detective Ladd then had appellant read the warnings at the top of the statement out loud in order to make sure that appellant could read. Appellant also told Ladd that he understood his rights. Finally, Ladd asked appellant if he had been threatened or promised anything in return for making the statement. Appellant replied that he had not been threatened and had not received any promises. These events were also testified to by Detective Shultz and Patricia Key, a stenographer in the homicide division who also witnessed appellant signing his written statement. We also note that appellant's written statement concludes with this last paragraph:

"I went to the 9th grade in school. I can read and write the english (sic) language. I have read the above statement and it is ture (sic) and correct. *I have given this statement to Detective Schultz (sic) of my own free will no threats or promises were made to me to make this statement."* (Emphasis Added)

At trial Detective Shultz testified that at no time did he ever threaten appellant or offer him some kind of deal in exchange for his confession.

The trial judge made detailed findings of fact and conclusions of law regarding appellant's motion to suppress the confession. This includes a specific finding that "[a]t no time up to, during, or after signing State's Exhibit 132 was the defendant threatened or promised anything in return for his confession." The trial judge went on to write:

"12. The Court does not find credible the defendant's contention that he was threatened, coerced, and told he would get a life sentence if he gave a written confession. The Court closely listened to and observed all the witnesses and testimony offered during the Motion to Suppress the confession and during the trial before the jury. When the Court assessed the credibility and weight to be accorded the witnesses' testimony, as well as reviewing State's Exhibit 132, the Court did not find believable the defendant's testimony offered in his Motion to Suppress hearing."

Although appellant contends his allegation was uncontroverted, we disagree. Appellant's reliance on *Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); *Farr v. State,* 519 S.W.2d 876 (Tex.Cr.App.1975); *Sherman v. State,* 532 S.W.2d 634 (Tex.Cr.App.1976); and *Smith v. State,* 547 S.W.2d 6 (Tex.Cr.App.1977) is misplaced. In those cases, there was a complete absence of evidence rebutting specific allegations of the defendants. In the instant case, we find that the

language of the last paragraph of appellant's written statement along with the testimony of Detective Schultz, Detective Ladd, Patricia Key and even of appellant on cross-examination rebutted appellant's allegation.

 The trial judge is the trier of fact at a hearing on the voluntariness of a confession. He is the exclusive judge of the credibility of the witnesses as well as the weight to be afforded their testimony. *Barton v. State,* 605 S.W.2d 605 (Tex.Cr. App.1980); *Myre v. State,* 545 S.W.2d 820 (Tex.Cr.App.1977). We find that the record, including appellant's own testimony on cross-examination, amply supports the trial court's finding that appellant was not promised a life sentence in exchange for his confession.

 Next we consider whether Detective Shultz made a misstatement of the law regarding oral statements and written statements which induced appellant to make a written statement. During direct examination at the hearing on the motion to suppress, the prosecutor questioned Detective Shultz as follows:

"Q. When he finished telling you what had happened orally, what was said or done next?

"A. After that, I asked if he wanted to put this in writing and he said that he might as well. I said that he—he asked would it make any difference if I put this in writing. I said it would make no difference whatsoever. 'You are charged with capital murder. Capital murder is punishable by death in the State of Texas; and if you make this confession, it is going to be used against you in court.'

"Q. What did he respond?

"A. He said, 'I promised myself when I got out of the pen the last time that the next time I went up I was going to make it a federal rap.' but he said, 'I didn't make it, did I?' I said, 'No.' I said, 'It is a state charge.' The only thing this time

was that if convicted he would go to death row."

On cross-examination, Detective Shultz reiterated:

"A. He asked if it would make any difference if he made a statement. I advised it would not, that all this would do would be to put down his side of what he wanted to put down as to what took place out there."

Appellant did not testify on direct regarding Shultz's statement to him concerning an oral versus a written confession. On cross-examination, however, he admitted that as a result of his prior experience with the criminal justice system, he knew that a written confession would be used against him in court.

As noted above, appellant is now contending that Shultz misstated the law regarding oral and written confessions and this misstatement of the law caused him to make his written statement. The trial judge in his findings of fact and conclusions of law addressed this contention as follows:

"... The Court finds that the intent and apparent meaning of Schultz's (sic) statement was that the charge filed would be the same, whether or not the defendant signed a written statement. The Court finds that the defendant was not misled by a false impression of the admissibility of an oral statement versus a written one...."

We have thoroughly reviewed the record and find that it supports the trial judge's conclusion. Nowhere in the record is there anything that suggests that Detective Schultz was referring to the admissibility of the statements and nowhere in the record is anything in the record to suggest that the appellant interpreted Detective Schultz's remarks to refer to the admissibility of the statements.

We find the confession was made voluntarily and properly admitted into evidence. This ground of error is overruled.

The judgment is affirmed.

TEAGUE, Judge, dissenting.

When a police officer induces an accused to give a written or oral confession by virtue of a misstatement of the law concerning the admissibility of the confession, the prosecution has got problems in attempting to either get the confession admitted into evidence or, if is admitted into evidence, to convince an appellate court to sustain the trial court's action.

In this instance, the State concedes that the police officer who took appellant's confession misstated the law to appellant with regard to the admissibility of an oral statement that appellant had made to him. The record clearly reflects that prior to taking appellant's written confession, the officer who took the confession told appellant that "it would make no difference whatsoever" whether appellant's statement was reduced to writing or was made orally.

As a matter of law, however, because no evidence was discovered by reason of appellant's oral statement, the only way appellant's oral statement could become admissible evidence against him was if the oral statement was reduced to writing and signed by the appellant. Thus, in order to induce appellant to give the written confession, the officer who took appellant's written confession lied to appellant, either intentionally or through ignorance. It is now time for the State to pay the piper for the officer's erroneous advice.

However, the majority declines to penalize the State; instead, it erroneously, without any basis therefor, awards the prosecution for the officer's wrongful actions by upholding the admission into evidence of the appellant's written confession. This it should not do because this encourages the law enforcer to become the law breaker.

I, therefore, am compelled to respectfully dissent to the majority upholding the admission into evidence of appellant's written confession.

ONION, P.J., joins.