**Willie James HALL, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2-86-272-CR.**

Court of Appeals of Texas,
Fort Worth.

Feb. 18, 1988.

Thomas L.G. Ross, Fort Worth, for appellant.

Tim Curry, Criminal Dist. Atty., and C. Chris Marshall, and Delonia A. Watson, Asst. Criminal Dist. Attys., Fort Worth, for State.

Before FENDER, C.J., and JOE SPURLOCK, II and FARRIS, JJ.

## OPINION

JOE SPURLOCK, II, Justice.

A jury found appellant, Willie James Hall, guilty of the offense of attempt to commit murder, TEX.PENAL CODE ANN. sec. 15.01 (Vernon Supp.1988), and TEX. PENAL CODE ANN. sec. 19.02 (Vernon 1974); and that he had been previously convicted of one felony. It assessed Hall's punishment at 60 years in the penitentiary. In two points of error, Hall complains that the court committed error by permitting the State to attempt to impeach the credibility of a defense witness, who was a juvenile, and by permitting the State to question the same witness about having been in juvenile detention. In his third point of error, Hall complains that the evidence was insufficient as a matter of law to convict him.

We affirm. We will review the evidence to address the third point of error first.

On April 25, 1985, Randal Culton, while working on his truck at the Jackson Square Apartments in Arlington, Texas heard a girl scream. He went to the area where he heard the scream and saw Hall confronting a young woman. They were yelling back and forth at each other. Culton intervened and escorted the girl to her apartment, and told a young man standing nearby to come get him if there was any further trouble.

Culton returned to his truck. Shortly thereafter the young man came to Culton and told him there was more trouble. As Culton went back toward the apartment he saw Hall in an altercation with another man. The man was on his knees and Hall had him by his hair. As Culton approached the two men to attempt to break up the fight, he realized that Hall had a gun. Hall pointed the gun at Culton who then began backing up because he was scared. The man on the ground was struggling to get up. As Culton turned to run, he was shot one time by Hall. He was struck in the left arm by a bullet which traveled through to the left rib cage where it lodged. Hall was arrested at the scene by the Arlington Police.

In his review of the evidence, Hall emphasizes different testimony. He says that when Culton first arrived on the scene where he and the girl were arguing, Culton told him to leave the girl alone and to "get the Hell out of there." The girl then asked Culton to escort her to her apartment. Culton did, but testified that he and Hall exchanged profanities and that Hall made threats toward him. Hall notes that he and the girl thereafter got into the argument again, and a crowd gathered. Hall then began to tell the crowd to leave them alone; that they didn't know what was going on. Hall says that the crowd had gathered because he was involved in a fight with a David Rogers. There was a verbal confrontation between Hall and Rogers and Hall asked his girl friend to get his "piece." At that time someone in the crowd screamed "he's got a gun."

Rogers ducked underneath some cars and Hall threatened to "waste him." Hall pulled Rogers' hair and beat him in the face with the pistol. While he had Rogers by the hair he was waving the gun around,

and as he and Rogers continued to struggle, the gun went off. Hall relies on Rogers' testimony that despite Hall's threats to Rogers, Hall never fired the gun at Rogers. Rogers testified that Hall let him go and that the gun went off. Other testimony was that the bullet struck Culton in the left arm as Culton was backing away from the fight. Gregory Rose testified that immediately after the shooting Hall went to assist Culton and told him he was sorry, it was an accident. However, Culton testified that after he had been shot and lay bleeding on the ground, Hall came up to him and said "[d]on't die on me, baby." At trial Officer Parker of the Arlington Police Department demonstrated to the jury the force necessary to pull the trigger and stated that it was a standard factory pull trigger.

In reviewing the sufficiency of the evidence to support a conviction based upon direct evidence, the evidence is viewed in the light most favorable to the verdict. *See Flournoy v. State,* 668 S.W.2d 380, 383 (Tex.Crim.App.1984); and *see Houston v. State,* 663 S.W.2d 455, 456 (Tex.Crim.App. 1984). The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Bonham v. State,* 680 S.W.2d 815, 819 (Tex.Crim.App.1984); *Wilson v. State,* 654 S.W.2d 465, 471 (Tex.Crim.App.1983) (opinion on reh'g).

The sufficiency of the evidence is a question of law. The issue on appeal is not whether we as a court believe the prosecution's evidence or believe that the defense evidence "outweighs" the State's evidence. *See Wicker v. State,* 667 S.W.2d 137, 143 (Tex.Crim.App.), *cert. denied,* 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984). If there is evidence which establishes guilt beyond a reasonable doubt, and if the trier of fact believes that evidence, we are not in a position to reverse the judgment on sufficiency of the evidence grounds. *See id.*

Hall argues that the evidence was insufficient to prove he intended to cause the death of Culton, because there was no evidence or other testimony which conclusively established that he pointed or aimed the firearm at Culton. To the contrary, we find the victim specifically testified that Hall pointed the gun at him. Culton testified:

> The man was, obviously, angry because I told him to leave the girl alone before. When I walked up to him, he pointed the gun at me and I started backing up because I was, obviously, scared. You know, he had a gun pointed at me.

In reviewing the balance of the testimony there is obvious conflict between what Culton testified to and what other witnesses testified to, as to whether Hall pointed a gun at Culton. We note that one of the witnesses, Gregory Rose, in answering a question from the prosecutor as to whether he saw a flash from the gun, said:

A. Yes.

Q. Who was holding the gun?

A. Willie.

Q. Did you see the direction that the barrel of the gun was pointed?

A. At that man.

Q. Did you see the direction that the flash went off in?

A. Towards that man.

On cross-examination, however, Rose testified that Hall didn't have the gun pointed at anybody, "he was just kind of pointing a little bit at everybody." We do not find this conflicting testimony is the same as insufficient evidence. The jury was free to believe or disbelieve the testimony of any of the witnesses or any part thereof, and in particular free to believe that Hall pointed the gun at Culton as Culton directly testified he did. We hold the evidence is sufficient by which the trier of fact could have found Hall guilty beyond a reasonable doubt. Hall's point of error number three is overruled.

In his first point of error Hall argues that the trial court erred in permitting the prosecutor to impeach the credibility of a juvenile defense witness, "Mary" (not her real name). He further argues in his second point that it was error for the court to permit the prosecutor to question "Mary" about her having been in juvenile deten-

tion. We will discuss these points of error together.

At trial, "Mary" was called by Hall as his witness. She was the young woman Culton had heard scream and who was arguing with Hall. Hall argues that his purpose in calling "Mary" as a witness was for her to give testimony consistent with his theory that he did not intentionally shoot anyone. In his brief, Hall makes a statement that she "was the witness who was there from the very inception of this whole incident...." The State agrees that she was a necessary witness to the incident, and that her testimony was material.

Hall argues that her testimony was probably "disbelieved by the jury because the State destroyed her by bringing forth the fact that she had been in reform school." We disagree. It is obvious from the record, that, if the jury "disbelieved her testimony", it was not because of an improper question asked by the State, but rather because the only consistency about her entire testimony was the inconsistencies throughout it. As we will discuss, we do not believe the State's question was an attempt to impeach the witness, nor did the court err in permitting the question.

The particular error about which Hall complains occurred when the prosecutor asked the witness on cross-examination the following question: "weren't you in reform school?" Defense counsel objected to the question because it was prejudicial and did not relate to any issue on the trial of the case, and it was improper impeachment of the witness. The court retired the jury and inquired into the matter outside the presence of the jury.

One prosecutor maintained that the question *would go to the truth, veracity and credibility of the witness, but* also said that the answer would show bias on the part of the witness. Defense counsel objected. The prosecutor *then responded that the State was not intending to go into the fact of why she went, but rather the facts of where she was at a certain particular time period.*

Under the State's theory of the case, revealed through the argument of the pros-ecutors, there was a fact situation that would develop through her testimony about why certain names were being called and about what the background of those objectionable names were, therefore, developing the reason behind the fight and subsequent shooting. The State had reason to believe that the witness had recently been in reform school and that was one of the things that Hall was using against the witness in the argument. The State's theory was that the witness' having been in reform school and having been released that very day was part of the development of the anger on the part of Hall.

In developing the testimony before the court, "Mary" testified that she was just released from the school that day; that she and Hall had gotten into an argument and that she had brought up the discussion of the school. After hearing the testimony taken outside the presence of the jury the court permitted the State to inquire about the matter once the jury was returned, and overruled Hall's objections to the testimony. In her testimony before the jury, the State did not ask "Mary" why she had been in reform school, but defense counsel did.

On appeal, Hall points out that by virtue of the TEX.FAM.CODE ANN. sec. 51.13(b) (Vernon 1975), it is improper to use a juvenile delinquency record, that is the act of adjudication or disposition of the child or evidence taken at the juvenile proceedings, in any way, except in further proceedings under the juvenile section. Hall argues it was improper to use the fact of such a hearing or the result of such a hearing for impeachment purposes. In support of his position, in addition to the statute, Hall relies on *Carmona v. State*, 670 S.W.2d 695 (Tex.App.—Texarkana 1984), *affirmed* 698 S.W.2d 100 (Tex.Crim.App.1985) (en banc); and also *Smith v. State*, 113 Tex. Cr.R. 124, 18 S.W.2d 1070 (1929). Further, Hall relies upon the decision in *Rivas v. State*, 501 S.W.2d 918 (Tex.Crim.App.1973) because, while the fact of the adjudication of a juvenile delinquency may be based upon proof of acts which would constitute felonies involving moral turpitude if committed by an adult, such an adjudication

does not constitute a conviction for a felony or misdemeanor involving moral turpitude in the case of a child. *Id.* at 919.

■ We agree with Hall, and hold that generally such an inquiry would be improper, both because it is statutorily precluded and because adjudication on any underlying act would not be a "conviction." The State agrees with the authority cited by Hall but, nevertheless, argues that, although the language of section 51.13(b) protects the confidentiality of juvenile court proceedings and the evidence used in those proceedings, it does not prohibit *any and all testimony* regarding an accused's juvenile years. In this, we agree with the State.

■ "Mary" the juvenile, was not an accused but rather a witness to a criminal act. The State first argues that the question was a permissible attempt to impeach the witness. We disagree. We believe that the admission of a juvenile record or evidence of events occurring subsequent to a juvenile hearing would be improper, if the State was attempting to use the evidence to try to impeach the credibility of a juvenile witness. *See Rivas*, 501 S.W.2d at 920. We would, under those circumstances, view the testimony as an improper attempt by the State to impeach the witness. However, such a finding is not necessary to the disposition of this case, as the State relies on an alternate theory supporting the admissibility of the evidence. The State argues the question was relevant to develop fully the facts of the case.

In her testimony before the jury, the witness made it clear that the "reform school" was not what would ordinarily be thought of by a person as a place of juvenile detention for a wrongful act. Her testimony was that the "reform school" was in fact the Willow Creek Adolescent Center and that she had been sent there because she did not get along with her mother. She had just been released on the day of the altercation with Hall and subsequent shooting of Culton. Her testimony relevant to the question on appeal was not given *solely* in the presence of the jury. As background information, *outside the presence of the jury* under cross-examina-

tion by the prosecutor, "Mary" testified before the court as follows:

THE COURT: I believe he asked you if you had been to reform school.

A. Yes, I was in Willow Creek for a week.

Q. (By Mr. Youngblood, Prosecutor) Had you just gotten back from reform school just before the incident in April of 1985?

A. Yes.

Q. Did Willie know that?

A. Yes.

· · · · ·

Q. Willie knew that you'd just gotten out; is that correct?

A. Yes.

· · · · ·

Q. But you-all were screaming at each other, eventually, right?

A. No, not exactly. We did not start screaming.

Q. Raising your voices, in other words?

A. A little, yeah.

Q. Did Willie ever call you a whore?

A. Not exactly.

Q. What did he say?

A. He exactly said—you know, he called me a slut, but, afterwards, he had said he was sorry afterwards.

Q. I'm sorry?

A. After he said it—a few minutes afterwards, he did apologize. He said he did not mean it.

· · · · ·

MR. STURNS: (Defense Counsel) Excuse me, Your Honor. Did she say he called her a whore or a slut?

THE COURT: She said a slut.

THE WITNESS: I said slut.

MR. STURNS: I want the record to speak the truth.

Q. (By Mr. Youngblood) We hope that's not true, ma'am.

What we're getting at is: Did Willie bring up against you in his name calling the fact that you had just gotten out of reform school?

A. No, he did not say nothing about it. I had told him that I was not exactly in the mood to argue. Can we wait until after I take a shower and everything, because I was just trying to get unraveled because I had just got out. And he did not bring anything up about it. If anyone brought it up, it was me.

Q. Didn't he tell you that you were messing up and you were going to go back?

A. No, sir.

Q. But you did tell him that you were not in the mood to argue because you had just gotten out of reform school?

A. To give me time to go take a shower and change.

Q. Had you literally just gotten out of reform school?

A. No, I had gotten out about 11:00 or noon that day.

Q. That's really what I mean: that day.

A. Oh, I thought you meant exactly.

Q. And you hadn't had an opportunity to even clean up yet?

A. Well, I had cleaned up, except I had went to go swimming to kind of relax.

Q. So, around noon of that day, April 25th, you got out of reform school and came back to your apartment?

A. Yes.

Q. You found out that your mother wasn't there?

A. She got out on a release deal—what do you call it? Visitor's deal—to come and get me and take me home.

.   .   .   .   .

Q. [Mary], why were you in reform school?

A. In the first place, because I don't get along with my mother?

Q. And what was it that caused you to get into reform school besides that? You understand reform school would have million of kids in it if that was the only reason?

A. I don't exactly call it a reform school. It was more of an adolescent center where you saw a doctor and talked your problems out.

Q. What doctor was this?

A. I don't remember his name.

Q. Were you seeing the doctor about—what was the nature of your problems?

A. Well, just to find out why me and my mother didn't get along and I ran away some.

Q. Don't you have a problem telling the truth to your mother about your activities and your lying?

A. I do tell her different stories, yeah.

Q. And do you have that problem with other adults? Is that correct?

A. I never have lied to a friend.

Q. But you've lied to other people besides your mother; is that correct?

A. No.

When the jury was returned the following questions were asked and answered by the witness to either the prosecutor or defense counsel as indicated:

Q. (By Prosecutor) Now, [Mary], what day did you get out of the reform school?

A. April 25th.

Q. What year?

A. '85

Q. Was that the day of the shooting that we're on trial here about? Is that right?

A. Yes.

MR. STURNS: Just for the record, Your Honor, I will object again to any question about reform school.

THE COURT: Thank you. That's fine. I'll give you a running objection.

MR. STURNS: Thank you, Your Honor.

Q. (By Prosecutor) Your mother was in the hospital; is that correct?

A. Yes.

Q. And she got a release to get you back home; is that right?

A. Yes.

Q. And isn't it also true that she returned to the hospital?

A. Yes.

Q. What was the arrangements made for Willie to take care of you?

A. We were to stay in the house and stay out of trouble and Willie was just, you know, to make sure that nothing happened and just to keep an eye on the apartment.

Q. Didn't your mother not really have a firm arrangement about this that she communicated to you?

A. She didn't really communicate it to me, but that's how it's always been when she goes to work and when she goes out on dates.

.    .    .    .    .

Q. Now, you and Willie had an argument; is that correct?

A. Yes.

Q. Did he call you names?

A. Yes.

Q. What name did he call you?

A. Slut.

.    .    .    .    .

Q. And this was at night, right?

A. Yes.

Q. And you had been drinking; is that correct?

A. Yes.

Q. Were you intoxicated?

A. Do you mean was I drunk?

Q. Well, I'll settle for that.

A. I was sort of, but not, you know—

Q. You were high; is that correct?

A. Yeah.

Q. You and Willie, did you raise your voices at one another?

A. At—yeah, but not that much.

Q. Now, you said that you were being very quiet in your argument; is that correct?

A. I was mostly letting him do the talking.

.    .    .    .    .

Q. And at some point Kim slammed the door in Willie's face; is that right?

A. Yes.

Q. And he was calling you a whore or slut or something to that effect; is that right?

A. When we were arguing, yeah.

Under redirect examination by defense counsel the following testimony was given by the witness.

Q. (By Mr. Sturns) The prosecuting attorney asked you about going to reform school. Was it a reformatory school, or what was it?

A. It was Willow Creek Adolescent Center.

Q. Why were you sent there?

A. Because I did not get along with my mother and got in a lot of arguments with her because she didn't agree with the people I dated.

Q. Did you run away from home from time to time?

A. Yes, I did have a deal of that.

Q. Was there someone who encouraged you to return home?

A. Yes.

Q. Who was that person?

.    .    .    .    .

A. Willie. I would always run to him.

The prosecutor further inquired:

Q. Did you mother disapprove of your dates? Is that correct?

A. Yes.

Q. So, sometimes, you ran away.

A. Well, we would get into arguments because I've never been able to get along with my mother from this day forward, and I still don't. We just get into arguments, and I leave.

Q. Did you sometimes lie to your mother about your situation?

A. I would tell her, yeah, I'm going out with so and so, and I'm really going out with someone else.

Q. Was that sort of a problem that you and she had: You felt like it was necessary to lie to her to do what you wanted to do?

A. Well, yes, sort of. I guess you can put it that way.

MR. YOUNGBLOOD: That's it, Judge.

We hold that the objection by the defense counsel under the evidence as it developed in the case was not well taken, and that the

trial court committed no error in not sustaining the objection.

We hold that the question asked was both material and relevant to the issues in the trial of the case, the underlying cause of the argument and possible motive in the subsequent shooting of a bystander. No attempt was otherwise made to impeach "Mary's" testimony. We find no harm occurred to the defendant by the court permitting the State to ask the question, or the witness to answer the same. We do not intend this holding to mean we believe it proper to ask juveniles about their juvenile records in an attempt to impeach their testimony. We limit our holding strictly to this case. We hold that admission of the evidence of the events occurring in the personal relationship between the witness and Hall on the day of the shooting was not so prejudicial to Hall as to outweigh its materiality or relevance. We hold that the court committed no error in permitting both the question and answer. Points of error one and two are overruled.

The judgment is affirmed.