

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| ALEXUS DOMINGUEZ, | § | No. 08-24-00082-CR |
|---|---|---|
| Appellant, | § | Appeal from the |
| v. | § | 34th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC#20210D00388) |

## MEMORANDUM OPINION

In two issues, Alexus Dominguez challenges the sufficiency of the evidence to support her conviction of capital murder, asserting (1) there is no independent evidence to corroborate her extrajudicial confession, and (2) there is no evidence of how Gonzalez died. We affirm.

## I. BACKGROUND

On September 9, 2019, the body of Arnulfo Apodaca Gonzalez was discovered by a civilian who was taking a scenic photo on Transmountain Road in El Paso, Texas. Gonzalez's body was found inside a rolled carpet that was situated off the side of a mountain on Transmountain Road. A multi-agency search team retrieved Gonzalez's body and transported it to the medical examiner's office for an autopsy.

## A. The autopsy report

At trial, Dr. Mario Alberto Rascon, El Paso County Chief Medical Examiner, testified to his autopsy findings. Rascon explained that Gonzalez's body was rolled in a carpet with foam padding. As Rascon unrolled the carpet, he retrieved what appeared to be an earing that was stuck in the carpet. Gonzalez's wrists and feet were tied with adhesive tape and his head was covered with a plastic bag. The plastic bag was removed, revealing several loops of adhesive tape that wrapped around Gonzalez's head, covering his eyes, nose, and mouth. There were significant postmortem decompositional changes to his body, including green discoloration of the skin, skip slippage, bloating, sloughing of the hair, and insect activity on the surface of the body. Gonzalez had a c-shaped laceration above the right eyebrow, three broken left lower ribs, and separation of two of the cervical vertebrae. Due to the advanced decomposition of Gonzalez's body, Rascon was unable to determine whether Gonzalez sustained these injuries while he was still alive. Because of the state of Gonzalez's body, Rascon ultimately opined that Gonzalez died of undetermined causes in an undetermined manner.

## B. The investigation

The investigation revealed that at the time of his death, Gonzalez was living in Nebraska with his brother, who was a truck driver. Gonzalez's parents told investigators that a few days before the murder, on August 26, 2019, Gonzalez and his brother drove to El Paso together. They had planned to meet at a Walmart and then go to a casino before leaving El Paso. However, when Gonzalez failed to show up as planned, his brother left town without him. After ruling out his brother as a suspect, the case went cold until December 2020.

On December 7, 2020, the El Paso Police Department received information from the Texas Department of Public Safety (DPS). A DPS trooper had a woman named Bianca Perez in custody

on an unrelated charge when she claimed to have information about the unsolved murder on Transmountain. She gave investigators three names, including Dominguez's, and stated that she went by the street name "Karma."

After further information was developed, a joint operation with the El Paso Police Department, FBI, and HSI (Homeland Security Investigations) was conducted at Dominguez's residence. Dominguez was eventually arrested and questioned about Gonzalez's murder. Authorities learned that Dominguez was affiliated with a cartel and believed she was the one "calling the shots" on the day of Gonzalez's murder. On September 9, 2019, and on Dominguez's orders, Gonzalez was taken to Dominguez's house, where she and her cohorts beat him to death and disposed of his body on Transmountain.

### C.  Dominguez's recorded interview

A video recording of Dominguez's police interview was admitted at trial and published to the jury.[1] Throughout the interview, Dominguez minimized her role in the murder. She initially denied killing Gonzalez, but admitted she was there when it happened. According to Dominguez, she, Adrian Corral, Eddie Chavarria (Young), Victor Hernandez (Crazy), Luis Carlos Ochoa (Toonz)[2], and two other men—Caesar (Sleeze) and Shaw—were at 117 West Point, her house, when the murder took place.

Dominguez referred to Gonzalez both as "the old man" and "Don Juan" and explained that she met him through a mutual friend. Dominguez claimed she never knew Gonzalez's real name because he concealed his identity, told her he had "ties" to southern cartels, and claimed to be a

---

[1]  A transcription of the video recorded interview was also admitted into evidence and published to the jury.

[2]  We refer to this individual as "Toonz" although the name incorrectly appears throughout the interview transcript as "Tombs."

big deal in an attempt to intimidate her. Gonzalez asked Dominguez to borrow $200 and a place to stay; in exchange, Gonzalez promised Dominguez military-grade guns. Dominguez agreed and allowed Gonzalez to stay in one of her spare bedrooms. However, Gonzalez never paid Dominguez back and did not deliver on the promised guns. At some point, Gonzalez "went M.I.A." and Dominguez had no idea where he was.

On the day of the murder, Dominguez, Young, and Sleeze were on their way to a casino when they spotted Gonzalez in a neighborhood doing yard work. They decided to approach Gonzalez to ask about the money and guns he owed, but Gonzalez saw them approaching and managed to flee in his friend's car. Dominguez and her group eventually caught up to Gonzalez near a park and confronted him. According to Dominguez, they all made fun of Gonzalez for running away and asked where he had been. Dominguez claimed she told Gonzalez, "Well, never mind then. We'll talk to you later then, because we're about to go back to the crib" and admitted she later ordered her cohorts to bring Gonzalez back to her home.

According to Dominguez, once they were all at her house, they were just "chilling" when Dominguez asked Crazy about money he owed her. This triggered Crazy, and he went "from zero to a hundred" and threw Gonzalez "under the bus" about the money he also owed Dominguez. The argument became physical and Crazy began to hit Gonzalez. According to Dominguez, she wanted Gonzalez out of her house and told him, "Get your sh*t. Get the f*** out!" But Crazy disagreed and told Dominguez not to let him go anywhere and according to Dominguez, she did not interfere because Crazy was her "homie" and "it was just happening, like quick." Dominguez claimed to once more attempt to kick Gonzalez out, but Gonzalez said to her, "Look at me in my eyes . . .You think I'm scared to die?" and called Dominguez a whore. Dominguez then punched Gonzalez and told him, "I don't give a f*** if you're scared or not, dog . . . but you're not going to f***ing talk

4

to me like that either, fool . . . I'm just wanting you to pay the money that you owe me dog, and give me the guns . . . Like, I need money, dog! . . . Money comes to me and goes, fool. I could get f***cking 30 of those guns, fool! I'm not tripping . . . But you're not gonna disrespect me in my house." Gonzalez then began to tell Crazy, "You don't know who the f*** you're f***ing with . . .That's why [] they want to kill you . . . just like how I'm going to kill your uncle." Crazy then "stomped" on Gonzalez and continued to stomp on him with his steel-toe boots. Dominguez described the first stomp as so brutal that it appeared to unfold in "slow motion" and "got him" to where Gonzalez was "crouched all the way down." Eventually, they all joined in, but Dominguez said that Crazy did "most of the damage" and admitted she hit Gonzalez "once or twice, maybe three times." According to Dominguez, once she realized Gonzalez was dead, she ordered Crazy to stop beating Gonzalez and said, "he's gone . . . Get him the f*** out of my house!" Crazy, Toonz, and Adrian then asked Dominguez, "What do you want me to do?" and she ordered them to get the mop while she "got the bleach." When Crazy tried to leave, Dominguez instructed him, "You better fucking [not] . . . Now it's time to do it all the way, bro," and "get rid of this fool, dog."

Crazy dragged Gonzalez to the garage and rolled his body in a carpet that was stored in the garage from Dominguez's home renovation. Crazy then asked Dominguez "where do you want me to put him?" Crazy, Toonz, and Adrian loaded Gonzalez's body in the bed of Adrian's pickup truck. Adrian drove; Dominguez sat in the front passenger seat; and the others rode in the back. Dominguez and her cohorts drove to Transmountain Road, chose a spot, and with Toonz's help, Crazy kicked Gonzalez's body off the truck.

The jury found Dominguez guilty of capital murder and she was sentenced to automatic life without the possibility of parole. Tex. Penal Code. Ann. § 19.03(a)(2). This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

### A. Legal sufficiency

In Issue Two, Dominguez challenges the legal sufficiency of the evidence and argues the State should not be relieved of their burden to prove that Gonzalez died as a result of her "striking [] Gonzalez with a blunt object on or about the body," as alleged in the indictment. Dominguez claims "there is no evidence regarding how the victim died, what killed him, or who killed him to support the jury's verdict."

### (1) Standard of review and applicable law

In reviewing the legal sufficiency of the evidence to support a criminal conviction, we view all the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (holding *Jackson* legal-sufficiency standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt"). This standard applies whether the evidence was direct or circumstantial. *Hooper*, 214 S.W.3d at 13.

We defer to the factfinder to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. In reviewing the sufficiency of the evidence, we examine the events occurring before, during, and after the commission of the offense, and may rely on actions which show the accused's understanding and common design to do the prohibited act. *Id*. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the

incriminating circumstances is sufficient to support the conviction." *Id*. As a reviewing court, we may not resolve any conflict of fact or assign credibility to the witnesses. *Id*. Instead, "we test the evidence to see if it is at least conclusive enough for a reasonable factfinder to believe based on the evidence that the element is established beyond a reasonable doubt." *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex. Crim. App. 1988) (en banc). (citing *Jackson*, 443 U.S. at 318).

As relevant here, a person commits the offense of capital murder if they commit murder as defined under § 19.02(b)(1) and intentionally commit the murder in the course of committing or attempting to commit kidnapping. Tex. Penal Code Ann. §§ 19.03(a)(2), 19.02(b)(1). A person commits murder as defined under § 19.02 if they intentionally or knowingly cause the death of an individual. *Id*. § 19.03(a)(2). Kidnapping is defined as intentionally or knowingly abducting another person. *Id*. § 20.03 (a).[3]

**(2) Analysis**

Dominguez argues the evidence at trial was "the deceased died of undetermined causes" and the evidence is legally insufficient because the State failed to prove the manner and means of the offense as alleged in the indictment—that Gonzalez died as a result of Dominguez "striking [] Gonzalez with a blunt object on or about the body." According to Dominguez, the State failed to prove the "specific act" committed by Dominguez "that led to Gonzalez's death, i.e., the *actus reus* of the offense." In response, the State maintains that Dominguez's first-hand account of the way Gonzalez was killed constituted legally sufficient evidence of the criminal act that caused his death, and any variance between the indictment allegation and the trial evidence is immaterial to Dominguez's legal sufficiency challenge. We agree and find that Dominguez's second issue is without merit. *See Johnson*, 364 S.W.3d at 298 ("[T]he act that caused injury does not define or

---

[3] On appeal, Dominguez does not challenge the evidence supporting the kidnapping element of the charged offense.

7

help define the allowable unit of prosecution for this type of [] offense, so the variance at issue cannot be material.").

In the present case, Dominguez was charged by indictment with capital murder, which alleged she:

> did then and there intentionally cause the death of an individual, namely [] Gonzalez, by striking [] Gonzalez with a blunt object on or about the body, and the defendant was then and there in the course of committing or attempting to commit the offense of Kidnapping of [] Gonzalez.

The variance here involves the charged acts of striking Gonzalez with a blunt object on or about the body, versus the act of striking and kicking Gonzalez with hands and feet. However, as Dominguez recognizes, murder is a result-of-conduct crime, meaning "[w]hat caused the victim's death is not the focus or gravamen of the offense; the focus or gravamen of the offense is that the victim was killed." *Johnson*, 364 S.W.3d at 298. For non-statutory allegations, the law allows for some variation in pleading and proof. *Id*. at 295. The Court of Criminal Appeals has explained that "[w]hat is essential about variances with respect to non-statutory allegations is that the variance should not be so great that the proof at trial 'shows an entirely different offense' than what was alleged in the charging instrument." *Id*. For example:

> some types of facts—such as the method by which a murder is committed—do not relate at all to the allowable unit of prosecution. The State could allege "poisoning, garroting, shooting, stabbing, or drowning," of a single individual, and those different acts would simply be alternate methods of committing a single offense. With only one victim, there can be only one murder, *regardless of how that murder is committed.*

*Id*. (emphasis added). The manner and means by which a victim's death was caused are not essential elements of the offense of murder. *Stafford v. State*, 248 S.W.3d 400, 406 (Tex. App.—Beaumont 2008, pet. ref'd). The focus or gravamen here is Gonzalez and the bodily injury that was inflicted—death. *See Johnson*, 364 S.W.3d at 298. The "precise act or nature of conduct in

8

this result-oriented offense is inconsequential" to a legal sufficiency challenge. *Id*. (quoting *Landrian v. State*, 268 S.W.3d 532, 533, 537 (Tex. Crim. App. 2008)). It therefore follows that the State was not required to prove the precise manner and means by which Gonzalez's death was caused. *See id*. The State also was not required to establish by medical evidence the cause of Gonzalez's death, and the State's failure to do so does not render the evidence legally insufficient. *See Mendoza v. State*, No. 01-13-00146-CR, 2014 WL 3045194, at *4 (Tex. App.—Houston [1st Dist.] July 3, 2014, pet. ref'd) (mem. op., on reh'g) (not designated for publication) (concluding the evidence was legally sufficient, and rejecting the argument that it was insufficient due to the absence of the medical examiner's cause of death, because the State presented other forms of evidence—including eyewitness testimony—that supported the jury's finding). Although the State presented testimony that hands and feet can be considered blunt objects, we reject Dominguez's argument that the State was required to prove the manner and means of the offense as alleged in the indictment, and we find the jury was presented evidence from which a rational juror could conclude Dominguez committed capital murder.

In her recorded interview, Dominguez recounted Gonzalez's murder in detail, admitting her presence and role. She explained how she ordered her cohorts to bring Gonzalez to her home because he owed her money and guns. Then, during the commission of the kidnapping, Dominguez described how Gonzalez was beaten to death by her and her cohorts. She detailed how Crazy stomped on Gonzalez with steel-toe boots, delivering a blow so forceful it seemed to unfold in "slow motion," ultimately bringing Gonzalez down. Dominguez detailed how she and Young struck Gonzalez for "disrespecting" her, while Toonz also stomped on Gonzalez and restrained his legs as the assault persisted. Although Dominguez claimed she attempted to allow Gonzalez to leave, she admitted she ultimately did not do so because Crazy was her "homie." Dominguez

acknowledged her participation in the fatal assault, noting that at one point, she realized Gonzalez was dead, yet the assault relentlessly continued as Gonzalez's body "twitch[ed]" and "jolt[ed]."

Furthermore, during Dominguez's recorded interview, she was shown a series of photos and was asked to notate each photograph describing how Gonzalez was killed, using her own words. These photos were admitted at trial. The first was a photo of her house. Dominguez confirmed the home in the photo was hers and wrote: "This is 117 West Point where the victim (don juan) was brought to me to meet him. This is where Victor, Toonz, me & Adrian assaulted and killed Don Juan. Don Juan was brought to me. He was assaulted and died." On the back of the photo, Dominguez wrote: "Victor, toonz & Adrian killed the old man. Everyone at one point did hit him." Dominguez signed and dated the photo. Dominguez was next shown a photo of the earing that was stuck in the carpet Gonzalez was rolled in and was asked whether it was hers. Dominguez responded, "Yeah, I have one like that. Wait—yeah, I think I did have some like that . . . I mean, honestly, it's been so long, but I know that I had earrings like that . . . I know I did." Dominguez confirmed this and wrote: "this is my earing (it looks like some I had) on the carpet[.]" Dominguez signed and dated the photo. She was then shown a photo of the carpet Gonzalez was rolled in and confirmed it was the carpet that was stored in her garage. The last photos were of the tape and rope used on Gonzalez, and Dominguez confirmed that both the tape and rope were from her garage, stating "everything that was used was from there [her garage]." These photos containing Dominguez's written confessions, along with her verbal confessions in the recorded interview, were admitted at trial and published to the jury, leading us to dismiss Dominguez's assertion that "there is no evidence in the record describing the way Gonzalez was murdered."

It is not the province of this Court to resolve conflicts of fact or assign credibility to witnesses; rather, the trier of fact is the sole judge of the credibility of the witnesses and the weight

10

of the evidence. *Rubio v. State,* No. 08-00-00341-CR, 2002 WL 125732, at *3 (Tex. App.—El Paso January 31, 2002, no pet.) (citing *Bonham v. State*, 680 S.W.2d 815, 819 (Tex. Crim. App. 1984) *cert. denied*, 474 U.S. 865 (1985)). Viewing all the evidence in the light most favorable to the verdict, we conclude the evidence was legally sufficient for a rational juror to find, beyond a reasonable doubt, that Dominguez committed the offense of capital murder. *See Hooper*, 214 S.W.3d at 13. Accordingly, Issue Two is overruled.

## B. Corpus Delicti Rule

In Issue One, Dominguez claims that apart from her confession, there is no independent evidence to "connect" her to the crime, which she alleges is required by the corpus delicti rule.

### (1) Standard of review and applicable law

The corpus delicti rule derives from common law and is a rule of evidentiary sufficiency that applies to convictions based on extrajudicial confessions. *Miranda v. State*, 620 S.W.3d 923, 928 (Tex. Crim. App. 2021). "When a conviction is based on a defendant's extrajudicial confession, that confession does not constitute legally sufficient evidence of guilt without corroborating evidence independent of that confession showing that the 'essential nature' of the offense was committed." *Id*. It is not required that the corroborating evidence prove the crime was committed; "it need only make this conclusion more probable." *Id*. (citing *Williams v. State*, 958 S.W.2d 186, 190 (Tex. Crim. App. 1997)). The rule's purpose is to ensure that a person is not convicted of a crime that never occurred, based solely on their extrajudicial confession. *Id*. The corpus delicti rule is satisfied "if some evidence exists outside of the extra-judicial confession which, considered alone or in connection with the evidence, shows that the crime actually occurred." *Salazar v. State*, 86 S.W.3d 640, 645 (Tex. Crim. App. 2002). In determining whether

11

the corpus delicti rule is satisfied, we consider all the admitted evidence, except the extrajudicial confession, and view it in the light most favorable to the verdict. *Miranda*, 620 S.W.3d at 928.

**(2)  Analysis**

Dominguez claims that apart from her confession, the remaining evidence—the earing, carpet, tape, and bag—do not independently "connect" her to the crime, and thus, there is no independent corroborating evidence that makes the occurrence of the crime more probable under the corpus delicti rule. However, Dominguez has misconstrued the corpus delicti rule.

The rule requires only two elements: (1) the occurrence of the specific kind of injury (a deceased individual during the commission of a kidnapping); and (2) somebody's criminality as the source of the injury (as opposed to an accident). *Salazar*, 86 S.W.3d at 644. The rule does not additionally require evidence independent of the confession that the accused is "connected" to the crime or is the criminal culprit, as Dominguez argues. *Id*. (explaining the corpus delicti rule "does not also require any independent evidence that the defendant was the criminal culprit."). Dominguez's first issue is predicated on an erroneous interpretation of the corpus delicti rule that is wholly unsupported by the law and is without merit.

As stated by Court of Criminal Appeals, in determining whether the corpus delicti rule is satisfied, we are tasked only with assessing whether there was any independent evidence which, considered with the confession, proved that someone murdered Gonzalez. *See id*. As explained above in Issue Two, we find there was ample evidence, including:

- Gonzalez admitted she ordered her cohorts to bring Dominguez back to her house.

- At Dominguez's house, Crazy began physically attacking Gonzalez.

- Dominguez punched Gonzalez and demanded the money and guns he owed her.

- Crazy stomped on Gonzalez with steel-toe boots until Gonzalez was crouched and badly injured.

- Dominguez admitted everyone joined in and admitted she hit Gonzalez "once or twice, maybe three times."

- Once Gonzalez was dead, Dominguez told Crazy to stop and ordered him to get rid of the body.

- She instructed Crazy, Toonz, and Adrian to get cleaning supplies, while she grabbed bleach. Crazy then dragged Gonzalez's body into the garage and wrapped it in a carpet.

- Crazy asked Dominguez "where do you want me to put him?" Then, Crazy, Toonz, and Adrian loaded Gonzalez's body in the bed of Adrian's pickup truck. Dominguez and her cohorts then drove to Transmountain Road and disposed of Gonzalez's body.

- Dominguez's verbal and written confession to killing Gonzalez, including her handwritten note that read: "This is 117 West Point where the victim (don juan) was brought to me to meet him. This is where Victor, Toonz, me & Adrian assaulted and killed Don Juan. Don Juan was brought to me. He was assaulted and died."

- Photographs depicting the crime scene, the condition of Gonzalez's body, the body wrapped in a carpet secured with rope and tape, the body abandoned on a mountainside, the recovery of the body from that location, and the autopsy report, were all admitted into evidence and published to the jury.

This evidence, when considered with Dominguez's confession, make it more probable that someone murdered Gonzalez. We therefore conclude that the corpus delicti rule is satisfied because sufficient independent evidence, when combined with the confession, establishes that Gonzalez was murdered by someone. *See Salazar*, 86 S.W.3d at 644. We reject Dominguez's flawed construal of the corpus delici rule and find the evidence satisfies the purpose of the rule. It assures that the crime Dominguez confessed to, and for which she was prosecuted, actually happened. *See id*. Accordingly, Issue One is overruled.

## III. CONCLUSION

Finding no error, we affirm the trial court's judgment.

MARIA SALAS MENDOZA, Chief Justice

May 27, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

(Do Not Publish)