

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ROBERT JEFFERY LILLER, | § | No. 08-16-00309-CR |
| Appellant, | § | Appeal from the |
| v. | § | 109th District Court |
| THE STATE OF TEXAS, | § | of Andrews County, Texas |
| Appellee. | § | (TC# 6568) |
| | § | |

## O P I N I O N

Robert Jeffery Liller was found guilty by a jury for the murder of Shane Rivera. Liller now challenges his conviction on appeal, contending that the evidence supporting the culpable mental state element of the offense was legally insufficient. Liller also argues that if we should find the evidence was insufficient to support his conviction for murder, we should not reform the judgment for the lesser-included offenses of manslaughter or criminally negligent homicide, but should enter a judgment of acquittal instead. We affirm.

## BACKGROUND

At approximately 12:05 a.m. on May 18, 2014, law enforcement in Andrews, Texas received a 911 call reporting a possible hit-and-run. Upon arriving at the reported scene, one of the responding deputies, Captain Rusty Stewart, saw the body of a man later identified as Rivera

lying on the highway. Rivera was deceased, and his body appeared to have been crushed by a motor vehicle. Captain Stewart also noticed tire marks which indicated to him that a vehicle had "peeled out" of the driveway of a residence. As a result of interviews at the scene, responding deputies began to search for Liller and his wife, Alicia Norton, who were suspected of being involved in Rivera's death. Law enforcement officers obtained arrest warrants for Liller and Norton, as well as search warrants for their 2006 Lincoln Navigator and their cell phones. The next day, deputies found the Lincoln Navigator, and saw that there was damage to the vehicle's passenger side mirror. Soon thereafter, deputies located and arrested both Liller and Norton.

In Liller's post-arrest interview with Captain Stewart and Texas Ranger Lieutenant Burleigh Locklar, Liller stated that at approximately 11:40 p.m. on May 17, 2014, he and Norton received threatening text messages from his brother, Bruce Liller (Bruce). At the time these messages were sent, Bruce was at Rivera's house, where they and several other people had been watching a UFC fight and drinking alcohol. These text messages taken from Liller's cell phone showed that Bruce accused Norton of being a "snitch" and that Bruce ordered Liller to bring Norton over to Rivera's house so that they could kill her. Liller responded to Bruce's texts, threatening to shoot him and others. Several other threatening messages were sent between Liller and his brother, which were later presented by the State at trial.

Shortly after texting Bruce, Liller and Norton drove to Rivera's house, where a fight soon broke out between Liller and Norton on one side, and Bruce, Rivera, and Rivera's wife on the other. When Liller and Norton got back into their vehicle, Liller described that Rivera and Bruce grabbed ahold of the vehicle's passenger-side mirror, and were attempting to not only break it off, but to also pull Liller out through the passenger-side window. Norton, who was driving the

vehicle, sped away. Liller claimed he did not know if the vehicle ran over Rivera. He claimed Rivera was dragged approximately ten to fifteen feet.[1] As he held Rivera, he claimed that Norton held onto his belt to keep him from being pulled out of the vehicle. Rivera and Bruce, he said, were trying to pull him out of the window. After Rivera fell, Liller stated that he and Norton left the scene because he was afraid that Bruce would attempt to harm him. Liller expressed remorse that Rivera had died, and stated that he had not had any prior conflicts with Rivera. As a result of his interviews with Liller and Norton, Captain Stewart learned that Liller and Norton did not file an accident report or contact law enforcement after the incident; instead, they traveled to their residence and various other locations outside of Andrews, Texas, before they were found and arrested.

At trial, the State first called Captain Stewart to testify. In his testimony, Captain Stewart recounted details about his investigation and his post-arrest interview with Liller, which eventually led to Liller's arrest. Through Captain Stewart's testimony, the State also presented the text messages sent between Liller and Bruce.

Next, the State called Brian Cummings to testify. Cummings was present at the Rivera house the night of the incident. Cummings testified he heard a commotion outside the house and he ran out to find Liller and Rivera about to fight. Once they started fighting, Cummings tried to break it up. Liller then got into the passenger seat of a Lincoln Navigator and the vehicle started to drive away with a woman driving. Cummings testified he ran after the vehicle and saw

---

[1] According to Captain Stewart, the distance between tire marks and the location of Rivera's body was 313 feet, or approximately one hundred yards. Texas Ranger Burleigh Locklar, Jr., also testified he conducted his own investigation at the scene and when he measured the distance from where the skid marks were seen and the location of the body, he too confirmed it was 313 feet.

3

Rivera's body dragging with his legs flailing as he attempted to get up on the passenger-side step-rail of the vehicle. Cummings testified he saw arms hanging out of the passenger window, holding onto Rivera, but he could not tell more specifically whether Rivera was held by his clothes, his hair, or his arm. Cummings estimated that Rivera was dragged for about one hundred yards. As the vehicle accelerated, Cummings saw Rivera fall and roll at least two or three times in the rearview lights. Cummings ran to Rivera and when he came upon him he was unresponsive. He yelled out to call 911. On cross-examination, when asked specifically, Cummings stated that when the vehicle first left the driveway, he couldn't see how Rivera was on the vehicle, whether he was choosing to hold on or if he was being held.

In addition, the State also presented testimony from Lieutenant Locklar, the Texas Ranger who interviewed Liller after his arrest. Lieutenant Locklar testified about his investigation and the post-arrest interview with Liller. He also testified that Cummings told him that Liller's arms were holding onto Rivera outside the Lincoln Navigator, and that Norton was holding onto his belt to keep Liller from going out the vehicle's window. The State next called a medical examiner, who testified that Rivera's boots had scrape marks consistent with being dragged across a roadway or concrete, and that in his opinion, Rivera's cause of death was due to blunt force trauma caused by being run over by a motor vehicle.

Finally, the State called Melvin Harris who testified that Liller came to his house at approximately 3 a.m., a few hours after the incident. Harris stated that Liller told him that he (Liller) had possibly killed Rivera. He described that he had reached out of the window and grabbed Rivera's ponytail, while telling Norton to "go" or "drive." While he held Rivera by his ponytail, he dragged him down the highway. Harris told Liller that he should probably turn

4

himself in to the authorities, to which Liller replied that he needed to "figure it out" before doing so. Liller left Harris's house, and then came back approximately four hours later, having still not turned himself into law enforcement.

Harris further testified that Liller had been texting his brother Bruce, who was the one that told Liller that he had killed Rivera. Liller told Harris that he had seen Rivera's feet dangling as he was holding him, and that when he let go, he felt a "little bump" as the vehicle was traveling, and that he and Norton did not pull over and stop to see what had happened. Harris testified that he was under the impression that Liller came straight to his house after the incident. On cross-examination, Harris testified that Liller told him that he could not see how he and Norton could have run over Rivera.

Both parties rested after Harris's testimony. The jury was charged on the affirmative defense of self-defense. The jury found Liller guilty of murder and sentenced him to twenty-five years' incarceration. This appeal follows.

## DISCUSSION

In his first issue, Liller argues that the evidence was legally insufficient to support his conviction for murder. Liller contends that the evidence was insufficient to support the culpable mental state element of the offense of murder, i.e., whether he intentionally or knowingly caused Rivera's death. In his second and third issues, Liller argues that, should we find legally insufficient evidence to support his conviction for murder, we should not reform the judgment to reflect a conviction for the lesser-included offenses of manslaughter or criminally negligent homicide, because he argues, there is also insufficient evidence to support those lesser-included offenses.

5

## *Standard of Review*

In a legal sufficiency challenge, we determine whether, viewing all evidence in the light most favorable to the jury's verdict, any rational jury could have found the essential elements of the charged offense beyond a reasonable doubt. *Britain v. State*, 412 S.W.3d 518, 520 (Tex. Crim. App. 2013) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Evidence may be legally insufficient when the record "contains either no evidence of an essential element, merely a modicum of evidence of one element, or if it conclusively establishes a reasonable doubt." *Id*. (citing *Jackson*, 443 U.S. at 320, 99 S.Ct. at 2789). We may not re-weigh evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Further, we presume that the jury resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that determination because the jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to their testimony. *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). Finally, in determining the legal sufficiency of the evidence to show a defendant's culpable mental state, and when faced with a record that supports conflicting inferences, we "'must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and [we] must defer to that resolution.'" *Cole v. State*, 46 S.W.3d 427, 431 (Tex. App.—Fort Worth 2001, pet. ref'd) (quoting *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991) (en banc)).

## *Analysis*

The State's indictment alleged that Liller "intentionally and knowingly cause[d] the death

of an individual, namely, Shane Rivera[.]" In his brief, Liller cites TEX. PENAL CODE ANN. § 19.02(b)(2) (West 2011), which provides for an alternate method for establishing murder. Under Section 19.02(b)(2), the elements of murder are satisfied when (1) a person (2) intending to cause serious bodily injury (3) commits an act clearly dangerous to human life, and (4) that act causes the death of an individual. Here, Liller was charged with "intentionally and knowingly caus[ing] the death of an individual, namely, Shane Rivera," and the jury charge contained identical language. Since this language tracks the murder statute under Section 19.02(b)(1), we address the issue under that provision instead of Section 19.02(b)(2). *See Vasquez v. State*, No. 08-07-00247-CR, 2010 WL 819188, at *3 (Tex. App.—El Paso Mar. 10, 2010, no pet.) (not designated for publication) (analyzing a sufficiency challenge under the particular subsection of Section 19.02(b)(2) which the defendant was indicted under and the jury was charged with).

On appeal, Liller challenges the legal sufficiency of the evidence supporting the culpable mental state element of the offense, i.e., whether he intentionally or knowingly caused Rivera's death. For the purposes of the offense of murder, a person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to cause the result.[2] TEX. PENAL CODE ANN. § 6.03(a) (West 2011). Likewise, in a prosecution for murder, a person acts knowingly, or with knowledge, with respect to a result of his

---

[2] Under TEX. PENAL CODE ANN. § 6.03(a), "intentionally" may be established by two different means, depending on whether an offense is a "nature of conduct" offense or a "result of conduct" offense. For "nature of conduct" offenses, the culpable mental state of "intentionally" is established when it is the defendant's conscious objective or desire to engage in the conduct. For "result of conduct" offenses, the culpable mental state of "intentionally" is established when it is the defendant's conscious objective or desire to cause the result. Murder is a "result of conduct" offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death. *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) (en banc). As such, we apply the "result of conduct" standard of "intentionally" to this particular offense.

conduct when he is aware that his conduct is reasonably certain to cause the result. *Id*. § 6.03(b).[3]

Viewing the evidence in the light most favorable to the jury's verdict, we conclude a rational jury could have found, beyond a reasonable doubt, that Liller intentionally or knowingly caused Rivera's death. First, the record shows that Liller sent a series of threatening text messages to Bruce before traveling to his residence. Specifically, Liller texted Bruce stating, "Who ever in the fuck keeps creeping around here is getting handled tomorrow I put that on pops grave," and "My shit loaded tell them pussy I ain't scared to let some rounds go." Bruce responded with an accusation that Liller's wife had been "snitchin," and "shit goin down." For the jury, these messages suggested that Liller went to Rivera's residence to confront Bruce and others. Moreover, hours after Rivera's death, Liller taunted Bruce with a text stating, "Who got killed and who's laughing now pussy ass bitches." From this text, the jury could infer from this statement that Liller intended to cause Rivera's death. While one of Liller's later texts stating, "[Rivera] tried to kill [him] and [his] pregnant girl and fuck around and got beat the fuck up," could support Liller's self-defense theory, the jury was free to reject that theory and presumably did so through their verdict.

In addition to text messages, the record also shows that after Liller traveled to Rivera's house to confront Bruce and others, he engaged in a physical altercation. Brian Cummings, who was present at Rivera's house and observed the events leading up to Rivera's death, testified that

---

[3] Likewise, under TEX. PENAL CODE ANN. § 6.03(b), "knowingly" may be established by two different means, again depending on whether an offense is a "nature of conduct" offense or a "result of conduct" offense. For "nature of conduct" offenses, the culpable mental state of "knowingly" is established when the defendant is aware of the nature of his conduct or that the circumstances exist. For "result of conduct" offenses, the culpable mental state of "knowingly" is established when a person is aware that his conduct is reasonably certain to cause the result. Again, murder is a "result of conduct" offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death. *Schroeder*, 123 S.W.3d at 400. Therefore, we apply the "result of conduct" standard of "knowingly" to this particular offense.

he saw "two arms" protruding from the Lincoln Navigator's passenger-side window holding onto Rivera before he was dragged for about a hundred yards and crushed by the vehicle. Through his own statements, Liller did not dispute that he was the person in the passenger seat. Thus, the jury could reasonably have inferred that Liller was holding Rivera as he was being dragged.

Other evidence also tended to establish that Liller intentionally or knowingly caused Rivera's death. Melvin Harris testified that Liller told him that he had held Rivera by his ponytail and told Norton to "go" or "drive" while they dragged Rivera down the highway before Rivera was run over and killed. Again, the jury was free to make the common-sense inference that Liller's encouragement to his wife to continue driving meant that he did not intend to safely release Rivera, but instead intended to cause Rivera to be run over and killed (or knew that he would be run over and killed) when he released Rivera while the vehicle continued accelerating down the road. *See Ross v. State,* 133 S.W.3d 618, 621 (Tex. Crim. App. 2004) (evidence that the defendant threatened the victim prior to her murder was evidence tending to establish the defendant's intent).

In addition, Liller's flight from the scene served as competent consciousness of guilt evidence which established that Liller knew what he had done was wrong, and likewise tended to establish Liller's guilt. *See, e.g., In re J.A.B.*, 440 S.W.3d 818, 822–23 (Tex. App.—El Paso 2013, no pet.) (evidence of flight is indicative of a consciousness of guilt and is a circumstance from which an inference of guilt may be drawn) (citing *Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007)). Further, Liller's failure to go to Rivera's aid, his failure to report the incident to law enforcement, the fact that law enforcement apprehended him instead of him voluntarily surrendering himself to law enforcement, and his statement to Harris that he needed to "figure it out" before turning himself in, also gave rise to the inference that Liller intentionally or

9

knowingly killed Rivera and needed time to create a plausible story establishing his innocence. *See, e.g., Bonham v. State*, 680 S.W.2d 815, 819–20 (Tex. Crim. App. 1984) (en banc) (evidence was legally sufficient to establish the defendant's intent to murder victim where, *inter alia*, the defendant ran over the victim with his car, did not go to her aid afterward, fled the scene, did not voluntarily contact law enforcement about the incident, and was apprehended by law enforcement eight days after the victim's death).

While Liller claimed that Rivera was attempting to pull him out of the vehicle, and the jury was charged on the affirmative defense of self-defense, the jury was allowed to reject Liller's theory and implicitly did so through their verdict. *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (en banc) (a jury may accept or reject defendant's self-defense theory, and a guilty verdict is an implicit rejection of a defendant's self-defense theory). In other words, the jury was free to reject either Liller's theory that Rivera was attempting to pull him out of the vehicle and Liller was only protecting himself, or his contention that Rivera fell off the vehicle without Liller pushing or releasing him. Thus, it was reasonable for the jury to make the inference that Liller was holding onto Rivera and then intentionally or knowingly caused his death by throwing or releasing him, causing him to be crushed under the vehicle's rear tire. *See id.* ("[d]efensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence[, and] [a] jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory"). The reconciliation of conflicts and contradictions in the evidence is within the province of the jury, and since credible testimony to support the conviction exists in the record

10

before us, we do not disturb the verdict. *See Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982) (en banc).

In conclusion, viewing the evidence in the light most favorable to the jury's verdict (as we must), we hold that there is sufficient evidence in the record to enable a rational jury to conclude beyond a reasonable doubt that Liller had the conscious objective or desire to cause Rivera's death, by holding and then releasing him, thereby causing Rivera to be run over and killed. Or, alternatively, that Liller was aware that his conduct was reasonably certain to cause Rivera's death given the circumstances. In other words, these facts provide a sufficient basis for the jury to have reasonably concluded that Liller either intended to cause Rivera's death by holding and releasing him, or that he knew that doing so would cause Rivera's death. Thus, the culpable mental state for murder was established, and the evidence supporting this element of the offense is legally sufficient to support Liller's conviction. *See Ross*, 133 S.W.3d at 621; *Saxton*, 804 S.W.2d at 914; *Bonham*, 680 S.W.2d at 819–20; *In re J.A.B.*, 440 S.W.3d at 822–23. Liller's first issue is overruled.

Because sufficient evidence exists to support Liller's conviction for murder, we do not enter a judgment of acquittal or reform his conviction to the lesser-included offenses of manslaughter or criminally negligent homicide. Liller's second and third issues are overruled.

## CONCLUSION

The judgment of the trial court is affirmed.


GINA M. PALAFOX, Justice

July 26, 2018

Before McClure, C.J., Rodriguez, and Palafox, JJ.

11

(Do Not Publish)