# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-20-00187-CR

---

**Horacio Palacious Martinez, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 277TH DISTRICT COURT OF WILLIAMSON COUNTY**
**NO. 18-0930-K277, THE HONORABLE STACEY MATHEWS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Horacio Palacious Martinez of the offense of aggravated assault with a deadly weapon against a family member. *See* Tex. Penal Code § 22.02(b)(1). Punishment was before the district court, which sentenced Martinez to 38 years' imprisonment. In two points of error on appeal, Martinez asserts that the evidence is insufficient to support his conviction and that his sentence constitutes cruel and unusual punishment. We will affirm the judgment.

## BACKGROUND

The victim in the case was Delia Perez, Martinez's ex-wife. The couple have three children together, and Martinez and Perez each had another child from a prior relationship. At trial, the jury heard evidence tending to show that Perez's marriage with Martinez had been abusive. Perez testified that Martinez "always cussed at [her], put [her] down," and made her

"feel worthless sometimes," "like property." Perez added that she "couldn't talk to guys at all" and "could only talk to girls." Martinez would not allow her to have male friends.

In December 2017, Perez separated from Martinez. When Perez had discussed leaving Martinez, he had told her, "If [Perez] wasn't with him, she wasn't going to be for nobody else," which Perez interpreted as a threat. Perez moved in with her mother and filed for divorce in February 2018. Martinez tried various ways to persuade Perez not to divorce him, including going to her mother's house and "leav[ing] a rose in [her] windshield in the mornings before [she] would leave to work," telling her that other men would not want her because she had four children, claiming that he loved her, and texting her questions such as, "When are we going to get back together?" Perez testified that Martinez's behavior scared her.

On the night of Friday, April 20, 2018, Perez went out dancing "with a guy." The children were staying with Martinez that weekend. Perez again went out with that man on Sunday. That night, Martinez was supposed to return the children to Perez's mother's house in Round Rock, but he did not do so. Instead, Martinez called Perez, told her that he had been drinking and that he did not want to risk getting pulled over by police in Williamson County, and asked her to come to his house in Cedar Park to pick up their children. Perez agreed, although she testified that she did not want to go to Martinez's house because every time she went there, Martinez "wouldn't let [her] leave" and "would sit in the car and try to get [her] to get back with him." Perez's nine-year-old son, J.,[1] accompanied her to Martinez's house.

When Perez arrived at approximately 10:00 p.m., she parked her car outside the front of the house and informed Martinez that she was there. Martinez "took a long time to get

_____

[1] We refer to Perez's minor son using an initial to protect his identity. *See* Tex. R. App. P. 9.10(a)(3).

2

out," and Perez told him that she had to leave because it was late. Martinez continued to take his time. Perez explained:

> And he brought the car seat, he buckled in the middle in the back, and then he went back inside, and he got my baby, [10-month-old M.], put her in the car seat. Then he said he had to go back inside for the bags. He would go inside, told me to open the trunk. And he was taking a long time and—like, he was thinking about something, and I knew—I could tell on his face that he was going to do something.

Martinez then told Perez that their other two children were still inside the house and asked her to come inside with him. Perez refused, telling him, "I'm not going inside that house anymore." Perez described Martinez's demeanor as "scary" and "angry." Perez testified that Martinez proceeded to open Perez's door, reach over to the ignition, and turn off the car. Perez turned the car back on and told Martinez that if he "didn't leave [her] alone, [she] was going to call the police." Martinez grabbed Perez's phone away from her and told her that she "was not going to call anybody."

Then, Martinez "pointed a gun at [Perez] on [her] left side," and the gun was close enough that she could feel it touching her. Perez recognized the gun as the one that Martinez had kept in his house for protection. Martinez grabbed Perez by the arm and told her to get out of the car. J., who was in the front passenger seat, reached for Perez and told Martinez not to hurt his mother. Perez tried to calm J., telling him, "Nothing's going to happen." Martinez pulled Perez out of the car and had her lean against the side of the car. Martinez maintained close physical proximity to Perez, continued pointing the gun at her, and kept telling her to come inside the house. Martinez was holding the gun close to Perez and "kind of low . . . like he didn't want somebody to see him or something." Perez screamed for help and Martinez covered

3

her mouth, telling her in Spanish to "shut up." The next thing Perez remembered was "dropping to the ground." Perez had been shot.

As she lay on the ground bleeding, Perez heard Martinez run away, go inside the house, come back outside, get into his car, and drive away so fast that he "burn[ed] tires." Her son came to her, hugged her, and told her, "Don't die, Mom." Perez told her son to get help, and he did so. EMS arrived shortly thereafter and transported Perez to the hospital, where the doctors were able to perform emergency surgery on her and save her life despite significant internal bleeding and injuries to Perez's liver, stomach, and small intestine.

Perez believed that Martinez had shot her on purpose. When asked why she believed this, Perez testified,

> That night, it was the way he was talking to me, the way he opened my door and took my phone . . . out of my car, the way he covered my mouth and shut me up, the way he told me to go inside and I didn't know what was going to happen to me, the way he pushed my child, the way he just left me there to die.

Perez added that she believed Martinez knew how to use the gun, that the gun never slipped out of Martinez's hand, and that Martinez had pointed the gun at her "the whole time" that it had been visible to her.

Martinez was apprehended later that night, with his gun, when his vehicle was stopped on Highway 290 near Brenham. Martinez spoke with police officers following his arrest, and his conversation with one of the officers was recorded by the officer's body camera and played for the jury. In the recording, Martinez admitted to shooting Perez but denied that he had "decided" to shoot her. He also expressed anger and resentment toward Perez, calling her a "bitch" and a "piece of shit," and explained to the officer that on Friday night, he had followed

4

Perez after she had left the dance club and was aware that she had spent the night with another man.

Martinez testified in his defense. He claimed that at approximately 10:00 p.m. on the night of the shooting, he had received a phone message from Perez telling him to return the children. Martinez sent her a text message in response asking her if he could return them the following morning, and Perez told him that she would rather pick them up herself that night if she could find someone to go with her to Martinez's house.

Martinez recounted that he had stored the gun in his car that day and had taken the gun out of the car before Perez arrived at his place because he was not sure if he would need to drive the children to Round Rock. After taking the gun out of his car, he placed it in his left pocket and went inside his house. Perez arrived shortly thereafter, and Martinez went outside and began loading the children's belongings into her car. When asked why he did not take the gun out of his pocket before loading items into the car, Martinez testified, "I never thought about getting it out of my pocket. It was way deep in my pocket, and I just started gathering things and putting them together."

Martinez testified that as he was loading everything into the car, Perez became angry with him because he "was taking a long time, that her mother was going to be upset, that [he] was taking too long." Martinez responded, "Well, it's your fault; you're the one that arrived late." He explained, "I was basically telling her that when she went out with somebody, to avoid this from happening, to prevent this from happening when she went out with somebody, she should tell that person that she had priorities that she needed to deal with, attend to."

Martinez further testified that because Perez "wasn't paying any attention to what [he] was telling her" as he loaded items into the back of her car, he went to the front of the car,

opened the driver's side door, and continued to talk to Perez there. She "continued to ignore [him]," so Martinez "went lower so that she could see [him]." As Martinez lowered himself closer to the ground, the gun began falling out of his pocket, and as it did so, he tried to get the gun and put it in his belt. At that point, Martinez claimed, Perez saw that he had a gun, told him that she was going to call the police, and got out of the car. Martinez testified,

> So at this point, we're together, we're standing close together, she's outside of the car, and I can feel that the weapon is falling—is falling out. So then I—she starts coming towards me, and I raise my hand to tell her to—to hold on, to wait for a second. And she says, 'You want to kill me.'

Martinez continued,

> So we're struggling. She's very scared. At that point, I hear her that she's yelling "[H]elp." So I feel we have the phone on one side, and I can—we're trying to hold onto the phone, both of us, and at that point, I feel the gun that's falling out, and I grab it. So I pull—I grab the gun, I take it out about five centimeters—I grab it with this gun [sic]—I pull it about—I pull it about five inches above the belt and at that point, the gun went off. I should not have had it where I had it.

Martinez testified that he had not intended to shoot Perez and denied grabbing her and pulling her out of the car. He also claimed that he "wasn't pointing [the gun] at her"; Perez just happened to be "standing in front of [him]" when the gun discharged. Martinez testified that he had purchased the gun in 2013 or 2014 and claimed that he had never used the gun before the night that Perez was shot.

When asked why he had not "stay[ed] to help" after Perez had been shot, Martinez testified, "Well, first, because I didn't know that a bullet had actually hit her." When asked how he did not know that Perez had been shot considering that they had been standing only a few feet apart, Martinez testified, "When the shot goes out, I don't know that she's shot. I

6

just see that she leans back towards the car and with the light of the—of the shot, I'm blinded. I'm not aware of what's happening." Martinez claimed that he had fled from his house after the gun went off because "Delia was there, and she was going to call the police. Or somebody was."

The jury convicted Martinez of aggravated assault as charged, and the district court sentenced him to 38 years' imprisonment. This appeal followed.

## DISCUSSION

**Evidentiary sufficiency**

In Martinez's first point of error, he asserts that the evidence is insufficient to support his conviction. As charged in the indictment, a person commits the offense of aggravated assaulted if the person intentionally, knowingly, or recklessly causes serious bodily injury to the victim, uses or exhibits a deadly weapon during the commission of the assault, and has a familial or dating relationship with the victim. *See* Tex. Penal Code §§ 22.01(a), .02(a), (b)(1). The only element of the charged offense that Martinez challenges on appeal is that he "intentionally, knowingly, or recklessly" shot Perez. He claims that the evidence establishes that "the shooting was an unfortunate accident."

"Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "We view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Id*. "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id*. "Juries can

7

draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial." *Id*.

"By its nature, a culpable mental state must generally be inferred from the circumstances" of the offense. *Romano v. State*, 610 S.W.3d 30, 35 (Tex. Crim. App. 2020). "Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant" before, during, and after the offense. *Guevara v. State*, 152 S.W.3d 45, 49–50 (Tex. Crim. App. 2004). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Additionally, when the record supports conflicting inferences regarding the defendant's mental state, as with any other element of the offense, "we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

The record in this case supports conflicting inferences regarding Martinez's mental state. In arguing that the shooting was accidental, Martinez points to evidence tending to show that he had not fired the gun before the night of the shooting and thus did not know how to use it, that he spoke to and cooperated with law enforcement after he had been arrested, and that he loved Perez and wanted to talk to her, not shoot her. There was also ballistics evidence tending to show that it was possible for a gun to be discharged accidentally.

However, there was other evidence tending to show that Martinez intentionally, knowingly, or recklessly shot Perez. This evidence included Perez's testimony that before the shooting, Martinez was loading items slowly into her car, "like he was thinking about something" or was "going to do something"; that Martinez's demeanor was "scary" and "angry"

8

that night; that Martinez pointed the gun at Perez while they were arguing; that Martinez continued pointing the gun at Perez the entire time that it was visible to her; that Martinez was holding the gun close to Perez and "kind of low . . . like he didn't want somebody to see him or something"; that the gun was close enough to Perez that she could feel it against her body; that Martinez acted aggressively toward Perez during the incident, including by reaching into the car and turning the ignition off, pulling Perez out of the car, grabbing her phone away from her, and telling her that she "was not going to call anybody" when she threatened to call the police; that Martinez maintained close physical proximity to Perez after she was out of the car; and that, immediately before shooting her, Martinez covered Perez's mouth and told her to "shut up" when she screamed for help. The jury also could have inferred that the shooting was not accidental from Martinez telling Perez, "If [Perez] wasn't with him, she wasn't going to be for nobody else," which Perez interpreted as a threat, and from Martinez's resentment and anger toward Perez for dating another man, which was apparent on the video recording of Martinez's conversation with an officer following his arrest, during which Martinez called Perez a "bitch" and a "piece of shit." Moreover, Martinez immediately fled the scene after the shooting with his weapon, from which the jury could have inferred Martinez's consciousness of guilt. *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) ("a factfinder may draw an inference of guilt from the circumstance of flight"); *Thompson v. State*, 691 S.W.2d 627, 630 (Tex. Crim. App. 1984) (finding shooting at close range and then fleeing scene of shooting could support inference by factfinder that appellant intended to kill victim). The jury could have reasonably inferred that if the shooting had been accidental as Martinez claimed, he would have stayed and tried to help Perez or at least called 911.

9

Because the record supports conflicting inferences regarding Martinez's mental state, we are to defer to the jury's resolution of the evidence in favor of the State's theory that Martinez intentionally, knowingly, or recklessly shot Perez. On this record, we conclude that the evidence is sufficient to support Martinez's conviction. *See Clay*, 240 S.W.3d at 905 n.11; *Guzman v. State*, 188 S.W.3d 185, 193–94 (Tex. Crim. App. 2006); *Guevara*, 152 S.W.3d at 50; *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Bonham v. State*, 680 S.W.2d 815, 819-20 (Tex. Crim. App. 1984).

We overrule Martinez's first point of error.

**Cruel and unusual punishment**

In his second point of error, Martinez asserts that his sentence of 38 years' imprisonment violates the federal and state constitutional prohibition against cruel and unusual punishment. *See* U.S. Const. amend. VIII; Tex. Const. art. I, § 13. Specifically, he claims that the sentence is "grossly disproportionate" to the offense. *See Graham v. Florida*, 560 U.S. 48, 59 (2010); *State v. Simpson*, 488 S.W.3d 318, 323 (Tex. Crim. App. 2016).

Martinez failed to preserve this issue in the court below. *See* Tex. R. App. P. 33.1(a). "A sentencing issue may be preserved by objecting at the punishment hearing, or when the sentence is pronounced." *Burt v. State*, 396 S.W.3d 574, 577 (Tex. Crim. App. 2013). Failure to complain about an allegedly disproportionate sentence in the trial court waives the error on appeal. *See, e.g., Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996) (concluding that defendant failed to preserve complaint that his sentence violated Texas Constitution's protection against cruel or unusual punishment); *Curry v. State*, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995) (concluding that defendant failed to preserve error on Eighth

Amendment complaint by not raising objection of cruel and unusual punishment to trial court); *Williams v. State*, 191 S.W.3d 242, 262 (Tex. App.—Austin 2006, no pet.) (observing that "[c]laims of cruel and unusual punishment must be presented in a timely manner" or are "waived"); *see also Carpenter v. State*, No. 03-17-00661-CR, 2019 WL 5152215, at *6 (Tex. App.—Austin Oct. 15, 2019, pet. ref'd) (mem. op., not designated for publication).

Martinez did not object to his sentence when the district court pronounced it in his presence at the punishment hearing. Instead, Martinez raised his complaint for the first time in a motion for new trial. However, "an appellant may raise a sentencing issue in a motion for new trial for the first time only if the appellant did not have the opportunity to object in the punishment hearing." *Burt*, 369 S.W.3d at 577 n.4 (citing *Hardeman v. State*, 1 S.W.3d 689, 690 (Tex. Crim. App. 1999)). There is nothing in the record here to indicate that Martinez did not have an opportunity to object to his sentence at the time it was pronounced, nor does he claim on appeal that he lacked any such opportunity. Accordingly, Martinez has failed to preserve this complaint for review. *See* Tex. R. App. P. 33.1(a); *Rhoades*, 934 S.W.2d at 120; *Curry*, 910 S.W.2d at 497; *Williams*, 191 S.W.3d at 262.

We overrule Martinez's second point of error.

## CONCLUSION

We affirm the district court's judgment of conviction.

_____

Gisela D. Triana, Justice

11

Before Justices Goodwin, Triana, and Kelly

Affirmed

Filed: August 26, 2021

Do Not Publish