

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS EL
# PASO, TEXAS

---

## No. 08-24-00380-CR

---

Kenith Harden, Appellant

v.

The State of Texas, Appellee

---

On Appeal from the 186th District Court
Bexar County, Texas
Trial Court No. 2022CR8067

---

## MEMORANDUM OPINION[1]

Appellant Kenith Harden was charged with capital murder in the shooting death of Darion

Dixon. In two issues, Harden challenges the sufficiency of the evidence to support his conviction

---

[1] This case was transferred pursuant to the Texas Supreme Court's docket equalization efforts. Tex. Gov't Code Ann. § 73.001. We follow the precedent of the Fourth Court of Appeals to the extent it might conflict with our own. *See* Tex. R. App. P. 41.3.

and asserts the prosecution failed to corroborate the testimony of his alleged accomplice to connect him to Dixon and the murder weapon. Finding no error, we affirm.

## I. BACKGROUND

### A. The shooting

Dixon was shot at the Vista del Rey Apartments (the apartment complex) in San Antonio, Texas, on April 27, 2022, and died three weeks later in ICU care. The shooting occurred in an upstairs unit of the apartment complex—unit 3709 in building 37. Several witnesses testified as follows at trial.

On the night of the shooting, Harden knocked on Mariela Jimenez's door at the apartment complex. He introduced himself as "Kenny," and said he was looking for her ex boyfriend about a necklace that had the name "King" on it. About five minutes after Harden left, Jimenez heard gun shots. She went outside and saw Dixon on the ground. Dixon told her to find his daughter and said "Kenny" shot him. Before Jimenez reached Dixon, someone else was already helping him.

Angelica Scott, another resident of the apartment complex, reached Dixon first. Before the shooting, Scott was waiting outside her unit for a friend to pick her up when she heard what sounded like glass shatter, followed by arguing and gunshots. She then saw a red car enter the parking lot across her unit and a man walk towards it. At trial, Scott identified the man as "Kenny" and described that he was carrying a long object resembling a gun, wrapped in a plastic bag. Harden got into the front passenger seat of the red car and fled while Dixon cried out for help. Scott ran to Dixon, laid him on the ground, pressed her shirt to his chest to slow the bleeding, and called 911. Dixon told Scott his full name and said, "King shot me" "[b]ecause of a necklace." Police arrived minutes later.

Officers Eduardo Pena, George McEntire, and John Vasquez of the Leon Valley Police Department arrived first. They found Dixon lying on the ground, covered in blood with a shirt

2

pressed against his wounds. Dixon gave the officers his name and said "Kenny" shot him. McEntire's bodycam captured the exchange, and the video was admitted into evidence without objection and published to the jury. Dixon's girlfriend later positively identified "Kenny" as Harden. Paramedics arrived soon after and transported Dixon to the hospital.

### B. The investigation

Detective Raul Alonzo of the Leon Valley Police Department was the lead detective on the case. When he arrived on scene, Dixon's girlfriend told him the suspected shooter lived at the apartment complex. Alonzo went to Harden's apartment and spoke with Harden's girlfriend, who allowed officers to sweep the apartment. Neither Harden nor a weapon were located that night.

Based on physical evidence and eyewitness accounts, investigators determined Dixon had been shot in unit 3709 on the third floor. He managed to walk down to the ground level, crying out in pain, while the shooter fled in a red car. Crime scene investigator Carlos Mario Carillo arrived to collect evidence and photograph the scene. Photos of unit 3709, two "quarter size[d]" bullet holes in the front door, and a blood trail leading down the stairway were admitted into evidence. Among the items collected at the scene were two spent shotgun shells—one on the ground level in front of building 37 and the other inside the unit. Carillo testified that, based on his experience and the location of three shots but only two shells, the shooter used a pump-action shotgun.

During the investigation, detectives learned Harden was a suspect in an unrelated case. That investigation led them to a shotgun owned by Scott Bush, a resident of the same apartment complex where Dixon was shot. Detective Christoper Lloyd of the San Antonio Police Department contacted Bush and went to his unit. Bush consented to a search, and officers recovered a 12-gauge shotgun. They submitted the shotgun for comparison with the shell casings found at the scene where Dixon was shot, and forensic testing confirmed the two shells were fired from Bush's shotgun. The shotgun and the two shell casings were admitted into evidence at trial.

Bush testified he owned the shotgun at the time of the shooting and knew Harden as "Black Kenny." Bush first claimed he did not recall lending Harden his shotgun. However, he had previously provided a video recorded statement to police stating otherwise. After being admonished on aggravated perjury and reviewing his recorded statement, Bush admitted he loaned Harden his shotgun after Harden told him "people were after him." Bush further testified Harden later returned the shotgun, then took it again without his permission.

Investigators also retained Harden's phone records showing he was at the apartment complex during the shooting. After securing a warrant, Harden was arrested on May 25, 2022. In a recorded interview, Harden admitted Dixon had stolen his necklace and that he was trying to get it back on the night of the shooting. The recorded interview was admitted into evidence and published to the jury.

Chief medical examiner Kimberley Molina testified that Dixon died from complications of multiple shotgun wounds. Buckshot pellets were recovered from Dixon's body and Molina ruled the manner of death as homicide.

## C. Harden's conviction

Harden was indicted for murder on August 18, 2022.[2] Tex. Penal. Code Ann. § 19.02. After a four-day trial, the jury found him guilty. The trial court sentenced Harden to 40 years in prison. This appeal followed.[3]

---

[2] Paragraph A of the indictment alleged Harden intentionally and knowingly caused the death of Dixon by shooting him with a firearm, and Paragraph B alleged Harden, with intent to cause serious bodily injury to Dixon, committed an act clearly dangerous to human life causing death by shooting Dixon with a firearm.

[3] We note that the certification of defendant's right to appeal does not include Harden's signature, as required by Rule 25.2(d). Tex. R. App. P. 25.2(d). We previously abated and remanded this appeal to the trial court after not having received Harden's appellate brief for a hearing to determine whether he wished to continue the appeal. Harden appeared and stated his intent to continue the appeal on the record. Having timely perfected the appeal, Harden has exhibited knowledge of his right to appeal and is not prejudiced by omission of his signature on the trial court's certification of right to appeal. *See Chambers v. State*, 654 S.W.3d 593, 598 n.5 (Tex. App.—Houston [14th Dist.] 2022, pet. ref'd); *Chapa v. State*, No. 05-19-00609-CR, 2020 WL 1129980, at *1 n.1 (Tex. App.—Dallas Mar. 9, 2020, no pet.) (mem. op., not designated for publication). We also note that Rule 48.4 requires that an attorney representing a defendant on appeal, within five days after the opinion is issued, send his client a copy of the opinion and judgment, along with

## II. SUFFICIENCY OF THE EVIDENCE

In Issue One, Harden contends the evidence is insufficient to support his conviction, asserting the State failed to prove he caused Dixon's death.

### A. Standard of review and applicable law

In reviewing the legal sufficiency of the evidence to support a criminal conviction, we view all the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (holding *Jackson* legal sufficiency standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt"). This standard applies whether the evidence was direct or circumstantial. *Hooper*, 214 S.W.3d at 13.

As the "sole judge of the witnesses' credibility and the weight to be given their testimony," we must defer to the factfinder to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Brooks*, 323 S.W.3d at 899–900, 902; *Hooper*, 214 S.W.3d at 13. We may not re-evaluate credibility or the weight of the evidence or substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *see also Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014) (holding that a reviewing court should not act as a "thirteenth juror"). Instead, "we test the evidence to see if it is at least conclusive enough for a reasonable factfinder to believe based on the evidence that the element is established beyond a reasonable doubt." *Blankenship v. State*, 780 S.W.2d 198, 207

---

notification of the right to file a pro se petition for discretionary review. Tex. R. App. P. 48.4. Accordingly, we address the merits of Harden's appeal.

(Tex. Crim. App. 1988) (en banc) (citing *Jackson*, 443 U.S. at 318). We must presume the jury resolved any conflicting inferences in favor of the verdict.

*See Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014) (citing *Jackson*, 443 U.S. at 319).

A person commits murder as defined under § 19.02 if they intentionally or knowingly cause the death of an individual or intend to cause serious bodily injury and commit an act clearly dangerous to human life that causes the death of an individual. Tex. Penal. Code Ann. §§ 19.02(b)(1), (2).

### B. Analysis

In his first issue, Harden argues the evidence was insufficient to prove "that [his] actions . . . caused the death of the victim in this matter." He specifically argues that no witness placed him near Dixon with a firearm; that Scott testified she saw a man leaving the apartment complex with a long black rifle but did not state the shotgun had a pistol grip instead of a stock; that Scott could not have properly identified an African-American man in the dark who she had never seen before; that no physical evidence tied him to the murder scene; that cell phone records only showed he was at the apartment complex where he lived, and those records do not establish he left the scene after the shooting. Our review of the entire record shows that Harden's arguments do not undermine the sufficiency of the evidence supporting his murder conviction.

Investigators determined Dixon was shot at around 9:00 P.M. Jimenez testified that Harden came to her apartment on the night of the shooting, identified himself as "Kenny," and asked about a necklace he described as having "King" on it. Five minutes later, she heard gunshots and saw that Dixon had been shot. When Jimenez approached Dixon, Dixon told her "Kenny" shot him. Scott testified she was outside her apartment at around 9:00 p.m. when she heard gunshots and saw a red car enter the parking lot across from her unit. She saw a man walk toward the red car and identified him at trial as Harden. She testified Harden held "a plastic bag and a long–looked like a gun." After

6

Harden fled, Scott ran to Dixon, and Dixon told her, "King shot me" "[b]ecause of a necklace." Although Harden claims no one placed him near Dixon with a firearm, circumstantial evidence and multiple witnesses show otherwise.

Additional corroboration identifying Harden as the shooter appears in the bodycam recording of the first responding officers. The video captured Dixon stating his name as "Darion Dixon," and when asked where he was, Dixon responded unit "3709." When asked, "Do you know who did this?" Dixon answered, "Kenny," then gestured toward his girlfriend, stating, "she knows him." Officers spoke to Dixon's girlfriend that night, and she confirmed that Dixon told her Harden had shot him. Based on statements from Dixon's girlfriend and other witnesses, detectives learned Harden lived at the same apartment complex and conducted a sweep of his apartment. Although officers did not locate Harden or a weapon that night, investigators later discovered Harden was a suspect in an unrelated case. A witness in that case provided information about a possible murder weapon owned by resident of the same apartment complex where Dixon was shot. Bush, who lived at that complex, confirmed he owned the shotgun, and officers later recovered it at his apartment. Because the shotgun was unique, and investigators determined a pump-action shotgun was used based on the casings recovered at the scene, they submitted the shotgun for comparison with the shell casings found at the shooting location. Forensic testing confirmed both shells were fired from that shotgun.

At trial, Bush confirmed he owned the shotgun at the time of the shooting and kept it leaned up against a wall in his living room. He testified he knew Harden, had "met him a couple of times," and called him "Black Kenny." Bush had previously given a video recorded statement saying he loaned Harden his shotgun and that Harden later took it again. After being admonished on aggravated perjury and reviewing his recorded statement, Bush confirmed he loaned Harden his shotgun because Harden said "people were after him," and that Harden took it a second time without his permission.

After officers arrested Harden, they interviewed him. Alonzo testified that Harden's story was inconsistent and "changed enough to the point that he couldn't understand what his story was." At the beginning of the video recorded interview, Harden denied knowing Dixon. After detectives told him they had information linking him to Dixon's murder, Harden said he knew Dixon as "D" Harden confirmed he lived in unit 4604 and that Dixon had been to his apartment before. He claimed he was not at his apartment complex on the night of the shooting, stating, "Honest to God bro I wasn't there." He said the last time he saw Dixon was when Dixon and another man came up to him and "snapped his necklace off of [him]."

Harden told detectives that on the night of the shooting, a man approached him and accused him of owing "someone" money and told him he would get his necklace back after he paid what he owed. He then changed his story, claiming this encounter occurred a month earlier. Harden said that on the night of the shooting, he was asking residents around the apartment complex about his necklace and was speaking to someone when he heard gunshots. Detectives responded, "But you just said you weren't there." Harden paused, then stated, "I said I didn't have anything to do with it . . . I don't know anything about it . . . at the moment, I didn't know what was going on." He claimed he left the apartment complex after the gunshots.

Harden later referred to Dixon as "Darion." Detectives told Harden he had initially claimed he did not know Dixon, then said he knew him as "D," and asked Harden how he suddenly knew his name. Harden responded that he learned his name was "Darion" because he had asked around for his "real name." When detectives pressed him on his inconsistent statements, Harden revealed he also knew Darion's last name was "Dixon." Detectives told Harden his "story wasn't adding up" and that he "[was] all over the place." When detectives asked him to walk them through the timeline, Harden contradicted himself again, stating, "I was not there [at his apartment complex]" and claimed he was at another apartment complex. Moments later, he explained, "I was coming

from my apartment, walking down towards the mailboxes[,]" prompting detectives to respond, "You just told me you weren't there but now you're saying you were. . . you're confusing us[,]" and while smiling, Harden replied, "I'm confusing myself too."

Harden's phone records and advanced location data confirmed he was at the apartment complex when Dixon was shot. Before the jury was the bodycam video in which Dixon said "Kenny" shot him. The jury was free to believe Dixon's dying words claiming that Harden shot him. *See Gardner v. State*, 306 S.W.3d 274, 286 (Tex. Crim. App. 2009) ("[T]he jury was entitled to believe Tammy's dying words that he was the killer, especially when her identification was corroborated by so much inculpatory circumstantial evidence of guilt."). The jury also viewed Harden's recorded statements made during his interrogation. A rational jury could have found Harden's version of the events not credible given his own inconsistent statements throughout his interview. *See Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991) (en banc) (assessment of credibility of defensive evidence is "solely within the jury's province and the jury is free to accept or reject the defensive evidence"). Harden denied knowing Dixon, then gave Dixon's full name; denied being present, then repeatedly contradicted himself. Although Harden argues it was "normal" for him to be at the apartment complex because he lived there, the jury saw him repeatedly contradict himself on whether he was present; as factfinder, the jury acts as "the sole judge of credibility." *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020).

This case turns on circumstantial evidence and credibility. Forensic testing confirmed that the two shells recovered at the scene were fired from Bush's shotgun, and Bush's testimony linked that shotgun to Harden[4]. Scott also testified that after she heard gunshots, she saw Harden holding

---

[4] Harden assumes that the shell casings were tested for fingerprints and states that because those results were not admitted into evidence, any results showing no connection to him would constitute a *Brady* violation. However, the only testimony in the record concerning this was from Carillo, who testified as follows:

Q:    And did you end up fingerprinting the shells?
A:    No, I did not.

a long weapon as he fled the scene. While Bush's recollection may have been inconsistent, "the jury . . . was free to accept or reject any part or all of" his testimony. *Ramirez v. State*, 842 S.W.2d 796, 800 (Tex. App.—El Paso 1992, no pet.). Moreover, Harden admitted that Dixon and another man robbed him of his necklace and that he was trying to get to the bottom of it on the night of the shooting.

When reviewing the sufficiency of the evidence, we examine the evidence of events occurring before, during, and after the commission of the offense, and may rely on actions which show the accused's understanding and common design to commit the prohibited act. *Dobbs*, 434 S.W.3d at 170. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* It is not the province of this Court to resolve conflicts of fact or assign credibility to witnesses; rather, the trier of fact is the sole judge of the credibility of the witnesses and the weight of the evidence. *Rubio v. State*, No. 08-00-00341-CR, 2002 WL 125732, at *3 (Tex. App.—El Paso January 31, 2002, no pet.) (citing *Bonham v. State*, 680 S.W.2d 815, 819 (Tex. Crim. App. 1984) *cert. denied*, 474 U.S. 865, (1985)). Viewing all the evidence in the light most favorable to the verdict, we conclude the cumulative force of all the incriminating circumstances was legally sufficient for a rational juror to find, beyond a reasonable doubt, that Harden murdered Dixon. *See Gardner*, 306 S.W.3d at 285 ("[T]he State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence."); *Dobbs*, 434 S.W.3d at 170; *See Hooper*, 214 S.W.3d at 13. Issue One is overruled.

---

Q:      Why don't you fingerprint the shotgun shells specifically?
A:      I wasn't fingerprinting the shells because there--the detectives were sending them
         somewhere else to be fingerprinted.

The *Brady* rule requires the disclosure of "evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial[,]" and here, there is neither evidence in the record confirming that such testing was conducted, or that the State was in possession of results favorable to Harden. *United States v. Bagley*, 473 U.S. 667, 675 (1985).

# III. ACCOMPLICE

In Issue Two, Harden contends that Bush's testimony, as his "accomplice," was not sufficiently corroborated to connect him to Dixon or the murder weapon.

## A. Applicable law and standard of review

Texas Code of Criminal Procedure Article 38.14 provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. Ann. art. 38.14. "A witness can be an accomplice as a matter of fact or as a matter of law." *Ash v. State*, 533 S.W.3d 878, 884 (Tex. Crim. App. 2017). A witness qualifies as an accomplice as a "matter of law" in three situations: (1) "If the witness has been charged with the same offense as the defendant or a lesser-included offense"; (2) "If the State charges a witness with the same offense as the defendant or a lesser-included of that offense, but dismisses the charges in exchange for the witness's testimony against the defendant"; and (3) "When the evidence is uncontradicted or so one-sided that no reasonable juror could conclude that the witness was not an accomplice." *Id*. at 886. When the evidence of the witness's complicity is inconclusive, "the accomplice-witness instruction asks the jury to (1) decide whether the witness is an accomplice as a matter of fact, and (2) apply the corroboration requirement, but only if it has first determined that the witness is an accomplice." *Zamora v. State*, 411 S.W.3d 504, 510 (Tex. Crim. App. 2013).

When evaluating the sufficiency of corroborating evidence, we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). The "evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App.

2008). "Rather, the evidence simply must link the accused in some way to the commission of the crime[.]" *Id*; *see also Simmons v. State*, 282 S.W.3d 504, 509 (Tex. Crim. App. 2009) (recognizing that the issue is whether "a rational fact-finder could conclude that the non-accomplice evidence 'tends to connect' appellant to the offense").

**B. Analysis**

We begin by noting that Harden did not request an accomplice instruction at trial and did not argue that Bush's testimony lacked sufficient corroboration.[5] He nevertheless maintains on appeal that "Bush testified that he loaned his shotgun to [Harden] . . . in furtherance of an unlawful purpose, being a felon with a firearm in [his] possession" and that Bush "should have anticipated that if he loaned [Harden] the firearm, because people were out for [Harden], that another crime would be committed by [Harden]." According to Harden, this renders Bush an accomplice. We disagree.

Bush cannot be considered an accomplice under any of the circumstances of the *Ash* test, as no evidence shows that Bush was indicted in connection to Dixon's murder or that the State offered him immunity in exchange for either his testimony or dismissal of any such charges. To the contrary, Bush testified that he was not considered a suspect in relation to Dixon's murder, only a witness. Nothing in the record indicates Bush knew Harden was a felon—a fact revealed in the punishment phase. As the Texas Criminal Court of Appeals has explained:

---

[5] Harden also does not assert jury charge error or challenge the absence of an accomplice instruction. Though defensive issues "[are] forfeited if not preserved at trial[,]" the Texas Court of Criminal Appeals has concluded that, "[a]n examination of the plain language in the accomplice-witness statute reveals that it is, in all its variations, the law applicable to the case rather than a defensive issue." *Zamora v. State*, 411 S.W.3d 504, 513 (Tex. Crim. App. 2013). "The fact that defense counsel failed to object to the omission of an instruction is only relevant in determining which standard of harm to apply." *In re M.E.R.*, 995 S.W.2d 287, 291 (Tex. App.—Waco 1999, no pet.), *abrogated* by *In re A.A.B.*, 110 S.W.3d 553 (Tex. App.—Waco 2003) in juvenile delinquency context. We consider the issue.

> An accomplice is a person who participates in the offense before, during, or after its commission with the requisite mental state. Presence at the crime scene does not
>
> make a person an accomplice; an accomplice must have engaged in an affirmative act that promotes the commission of the offense that the accused committed. A person is not an accomplice if the person knew about the offense and failed to disclose it or helped the accused conceal it.

*Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). There is simply no evidence showing Bush participated in the offense, had the requisite mental state, or performed any affirmative act to promote the commission of the offense.

Harden argues that "when the evidence of Mr. Bush is eliminated, [there] is no other evidence of an incriminating nature tends to connect [Harden] to the shotgun that was used in this matter." This argument, however, is premised on a misstatement of the law because even if Harden were an accomplice, Article 38.14 requires corroboration "by other evidence tending to connect the defendant with the *offense committed*." Tex. Code Crim. Proc. Ann. art. 38.14 (emphasis added). It does not require corroboration specifically connecting Harden to the weapon.

Here, the evidence nonetheless connects Harden to the offense. Scott and Jimenez both placed Harden at the scene and identified him in court. Jimenez testified that Harden came to her door on the night of the shooting, presented himself as "Kenny," and asked about a necklace he described as having "King" on it. She heard gunshots five minutes later and saw that Dixon had been shot. Dixon told her "Kenny" shot him. Scott testified that after she heard gunshots, she saw Harden walking towards a red car and identified Harden at trial. She testified Harden held a long object that "looked like a gun" as he fled. Dixon told Scott, "King shot me" "[b]ecuase of a necklace." Dixon's statement captured on the bodycam video directly identified Harden as the shooter, and testimony established that Dixon's girlfriend confirmed that Dixon told her "Kenny" shot him, whom she identified as Harden. All that is required is that the "evidence [] simply [must] link the accused in some way to the commission of the crime[;]" we find that it does. *Malone*, 253 S.W.3d 257. Issue Two is overruled.

13

## IV. Conclusion

Having overruled Harden's two points of error, we affirm and the trial court's judgment of conviction.

MARIA SALAS MENDOZA, Chief Justice

February 24, 2026

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

(Do Not Publish)